# CONDENSED DEPOSITION TRANSCRIPT OF DAVID CRABTREE

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION
CASE NO.: 4:08-cv-3590-TLW

WESTGATE MYRTLE BEACH, LLC, a
Florida Limited Liability
Company,

    Plaintiff,

vs.

HOLIDAY HOSPITALITY
FRANCHISING, INC., a Delaware
Corporation,

    Defendant.

_____/

Deposition of: David Crabtree

Taken By:    The Defendant

Date:    May 17, 2010

Time:    11:41 a.m. - 4:01 p.m.

Location:    Greenspoon Marder, P.A.
    201 East Pine Street
    Suite 500
    Orlando, Florida 32801

Reported By:    Emily W. Andersen,
    Registered Merit Reporter

Zacco & Associates Reporting Services
605 East Robinson Street, Suite 430
Orlando, Florida 32801
(407) 425-6789

## Page 2

APPEARANCES FOR THE PLAINTIFF
Amanda L. Chapman, Esquire
David R. Lenox, Esquire
Of:  Greenspoon Marder, P.A.
    201 East Pine Street
    Suite 500
    Orlando, Florida 32801
    (407) 425-6559

APPEARANCES FOR THE DEFENDANT
Richard A. Farrier, Jr., Esquire
Merritt Abney, Esquire
Of:  Nelson, Mullins, Riley & Scarborough, LLP
    151 Meeting Street
    Sixth Floor
    Charleston, South Carolina 29401
    (843) 720-4301

## Page 3

INDEX
                            Page
Deposition of David Crabtree
    Direct Examination By Mr. Farrier    4
Certificate of Oath    117
Certificate of Reporter    118
Read & Sign Letter to Witness    119
Errata Sheet (To be forwarded upon execution)    120

EXHIBITS

Defendant's    Page
For Identification
Exhibit  Notice of Taking 30(b)(6) Deposition    6
1    of Westgate Myrtle Beach, LLC
Exhibit    Composite, Exhibit Binder    8
2

Rule 1.310 (g) Florida Rules of Civil Procedure requires
transcript copies to be obtained from the court reporter,
unless the court rules otherwise.

## Page 4

              P R O C E E D I N G S
             - - - - - - - - - - - -
             David Crabtree,
Having been first duly sworn, testified as follows:
    THE WITNESS: Yes.
        DIRECT EXAMINATION
BY MR. FARRIER:
    Q.  Mr. Crabtree, I introduced myself a moment ago.
My name is Richard Farrier, and I'm a lawyer in Charleston,
South Carolina.  I'll be taking your deposition today.
    And it sounds like from our predeposition
introductions, this is not the first time you've ever seen
a deposition.
    A.  That is correct.
    Q.  You've been deposed before.
    A.  Yes.
    Q.  The local rules of our court require that I tell
you one thing, and that is that once this deposition
begins, you're not able to consult with your lawyer about
any matters outside of issues of privilege.  That varies
from jurisdiction to jurisdiction.  In many jurisdictions
it's very commonplace to go out and say how am I doing, I
was thinking about this, should I say it -- a normal
attorney/client privileged conversation with a lawyer; not
so with cases pending in South Carolina District Court.

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Westgate v. Holiday Hospitality

David Crabtree  May 17, 2010

Page 5

1    (Ms. Chapman exits the deposition room.)
2    BY MR. FARRIER:
3    Q.  So I need to tell you that once this begins, if
4    you need to consult with your lawyer about some issue of
5    privilege, you may do that, although I have a right to exam
6    you about that discussion.  Issues of privilege would
7    extend to any questioning that you feel is invasive or
8    abusive, but I don't think we'll get there, not today.
9    This deposition is a 30(b)(6) deposition.  We're
10   actually deposing your employer, Westgate.  One of the
11   things that is a little bit unusual -- have you been
12   through a 30(b)(6) deposition before?
13   A.  I have.
14   Q.  Okay.  Throughout this process, I'm going to use
15   pronouns, because that's the way we speak.  And when I say
16   "you" and "your", I'm referring to Westgate.  When I say
17   "me" or "my", I'm referring to my client.
18   We're also going to take your deposition in your
19   personal capacity here today.  And the way I'd like to do
20   that -- actually, I'm going to stop for a second, because I
21   want Amanda to be in here.
22   A.  Okay.
23   (Ms. Chapman returns to the deposition room.)
24   MR. FARRIER:  I was just about to talk about you,
25   Amanda, and I wanted you in here while I did it.

Page 6

1    I was just talking about the 30(b)(6) process.
2    MS. CHAPMAN:  Yes.
3    MR. FARRIER:  And we're deposing Mr. Crabtree in
4    both his personal capacity and his corporate capacity.
5    I understand and I want to go through the areas of
6    which you have been designated, by the company, to
7    speak on behalf of the company.
8    And I understand those to be -- let's go ahead and
9    mark the deposition notice as Exhibit No. 1.
10   (Thereupon, Defendant's Exhibit No. 1 was marked
11   for identification.)
12   BY MR. FARRIER:
13   Q.  I understand that you are the corporate designee
14   within Exhibit No. 1, which is the Notice of Deposition.
15   You've seen that document before, have you not?
16   A.  I have.
17   Q.  Okay.  That you are the designee for number three,
18   number five, number six, along with Mr. Moore for number
19   eight, number nine, and number ten.  Is that correct?
20   A.  I was on the wrong page.  Go through it real quick
21   for me.  I was looking at the definitions.  I apologize.
22   Go ahead.
23   Q.  Number three?
24   A.  Okay.  Yes.
25   Q.  Number five?

Page 7

1    A.  Yes.
2    Q.  Number six?
3    A.  Yes.
4    Q.  Along with Mr. Moore, number eight?
5    A.  Yes.
6    Q.  Number nine?
7    A.  Yes.
8    Q.  Number ten?
9    A.  Yes.
10   Q.  Very good.  The easiest way to handle this,
11   instead of taking your deposition twice, because there's
12   some overlay, I'm sure, about things that you've been
13   designated to speak about and things that you may not be
14   the designee for, but that you may be -- you may have some
15   personal knowledge of.
16   If we get into an area like that, I would ask
17   either your lawyer or you to tell me, wait a second, that's
18   outside of what we're proposing Mr. Crabtree as a depo
19   designee for.  And if so, then I'll come back and try to
20   ask you the questions in your personal capacity.
21   If I, for instance, I start asking you about
22   something that fell into number seven, which is any failure
23   of the property to meet the hotel quality standards, you or
24   your lawyer might say, you know, that's really not my area,
25   and I'll respect that.

Page 8

1    But I may go back and say, let me ask you what you
2    know of your own personal knowledge of this area.  And
3    either you have personal knowledge or you don't, but I'll
4    respect the fact that you are not the designee.  But at the
5    same time, you'll need to tell me if we drift into these
6    areas, because sometimes the areas are not so clearly
7    delineated.  Is that fair?
8    A.  That's fair.
9    Q.  Let me start out by talking to you about the early
10   part of at least the chronology in here.  And I want to
11   talk about 9/24/2004, and that's the date of the purchase
12   agreement.  Are you familiar with that?
13   A.  I'm familiar with the purchase agreement.  The
14   specific date -- you know, it sounds reasonable.
15   MR. FARRIER:  Okay.  Let's go ahead and mark as
16   Exhibit No. 2, the binder.
17   (Thereupon, Defendant's Exhibit No. 2 was marked
18   for identification.)
19   BY MR. FARRIER:
20   Q.  If you'll look under tab number one in Exhibit
21   No. 2, you'll see the purchase agreement.  And if you flip
22   the page, a couple more pages until you get to the -- there
23   you go.  You will see that was executed on 9/24.
24   A.  Yes.
25   Q.  Okay.  And the other date that I just want to

2 (Pages 5 to 8)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

**Page 9**

1   start out with is if you flip to tab number two in that
2   same exhibit, you'll see that the license agreement under
3   which MM -- I mean MBII was operating was executed in 1999.
4       A.  The date on the cover is July 1, 1999.  I'm
5   looking for the signature page.
6           There's no date on the signature page, but it says
7   July 1, 1999 on the top page.
8       Q.  Very good.  So what I'd like to do is focus on
9   9/24 of 2004 and the knowledge of Westgate at the time that
10  it entered into the agreement to purchase.  That agreement
11  that we just looked at, the purchase agreement, was not the
12  closing, but it was an obligation for Westgate to close,
13  assuming certain contingencies were met.  Correct?
14      A.  That is correct.
15      Q.  And as of the date of the execution of that
16  document, Westgate knew that it was going to be obligated
17  to purchase as long as those contingencies were met that
18  were set forth in that agreement.  Correct?
19      A.  That is correct.
20      Q.  Now, Westgate was only buying property up there.
21  It was not buying the franchise agreement.  Correct?
22      A.  Correct.  We entered into an agreement to buy the
23  property.
24      Q.  All right.  And I want to be specific about the
25  second part.

**Page 10**

1           In fact, you had an agreement with MBII that you
2   had no expectation that it could transfer the franchise
3   agreement or the license agreement.  Correct?
4       A.  We -- we entered into the agreement knowing that
5   we were buying the hotel, but we did have -- we were
6   hopeful that we'd be able to enter into an agreement with
7   Holiday Inn to get a permanent franchise agreement with
8   them for a multitude of reasons.  But they did not have the
9   right to transfer without consent of Holiday Inn.
10      Q.  That's the specific question I'm asking you.  And
11  you knew that Westgate knew that at the time that it
12  entered the 9/24 agreement.  Correct?
13      A.  That's correct.
14      Q.  You knew that you would have to deal with my
15  client on its own.  You'd have to file an application and
16  be approved for any franchise agreement.  Correct?
17      A.  That is correct.
18      Q.  You also knew that Westgate (sic), if it
19  transferred the property, in fact, if it went forward with
20  this transaction to sell the property to you, that would
21  trigger a termination of its license agreement.  Correct?
22      A.  Well, we actually were hopeful to have a transfer,
23  but that would have to be approved by Holiday.
24      Q.  Not my question.  My question was, I'll start off
25  by saying, Westgate had reviewed the 1999 license agreement

**Page 11**

1   prior to entering the 9/24 agreement marked under tab
2   number one.  Correct?
3       A.  That is correct.
4       Q.  That was part of its due diligence before entering
5   into this transaction.  Right?
6       A.  That is correct.
7       Q.  And that would be normal because this is not -- I
8   don't mean relative to your other deals, but this is an
9   $18 million transaction.  You would do due diligence before
10  entering into something like this.  Correct?
11      A.  That is correct.
12      Q.  So, in reviewing the contractual language of the
13  1999 agreement, you knew that under the current existing
14  license agreement, that a transfer of the property would
15  trigger a termination of the license agreement.  Correct?
16      A.  That is correct.
17      Q.  All right.  And you also knew that Westgate --
18  excuse me, that MBII, upon termination, was going to be
19  subject to liquidated damages.  Correct?
20      A.  That is correct.
21      Q.  And in fact, in the 9/24/2004 purchase agreement,
22  Westgate agreed to say those liquidated damages.  Correct?
23      A.  That is correct.
24      Q.  And one of the conditions precedent prior to the
25  actual closing on this transaction, on the purchase of the

**Page 12**

1   property, was that those liquidated damages be escrowed,
2   paid in by Westgate, and available to MBII.  Correct?
3       A.  That is correct.
4       Q.  So as of the execution of that document under tab
5   number one in Exhibit No. 2, the liquidated damages was, in
6   fact, a sunk cost for Westgate.  Correct?
7       A.  A sunk cost to the purchase of the property, but
8   also, we were looking at that as good faith on our part,
9   hopeful that we could get an agreement together with
10  Intercontinental and retain the Holiday Inn.
11      Q.  But you would agree with me that it was a sunk
12  cost.
13      A.  Exactly how I just responded is the way my
14  response would be again.
15      Q.  Was it a sunk cost as to the purchase of the
16  property?
17      A.  It was a cost as a purchase of the property, yes.
18      Q.  Okay.  And you never had a deal with the seller
19  relative to recovery of that sunk cost, did you?
20      A.  No.
21      Q.  And as of the time of the execution of that
22  document, you had not spoken subsequently with anyone
23  representing my client.  Correct?
24      A.  I had not personally spoken with anyone in the
25  organization.  When it came to the purchase of the property,

3 (Pages 9 to 12)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

## Page 13

1   Mark Waltrip was more involved at that point in time.
2        It wasn't until after we closed on the property
3   that I took more of the lead.  I was in discussions with,
4   you know, considering whether we were going to move forward
5   or not and enter into the contract, but Mark was the leader
6   on the purchase of it.  And then once it was signed, that's
7   when I took over as the leadership of it.
8        Q.  I want to break that down.  You're giving me your
9   personal response, and this is sort of what we were
10  referring to early on.  My question really is a corporate
11  question, and if you can't answer it, that's okay.
12        To your knowledge, did Westgate -- and this is
13  designed for you to answer on behalf of Westgate.  Did
14  Westgate have any substantive conversations with any
15  representative of my client prior to execution of the
16  document that we've marked under tab one of Exhibit 2?
17        A.  Not that I know of in my personal capacity, but I
18  can't respond for the company as a whole because someone
19  else may have.
20        Q.  Okay.  In fact, part of the agreement between
21  Westgate and MBII was that there would be no discussion
22  between Westgate and my client prior to entering the
23  purchase agreement that's marked as tab one.
24        A.  Not that I'm aware of.
25        Q.  Okay.  That was a long question.  Are you saying

## Page 14

1   that you're not aware --
2        A.  Not that I'm aware of in my personal capacity, but
3   I can't -- Mark Waltrip is the -- would be the corporate
4   representative related to the purchase and sale agreement.
5        Q.  And I asked you a poor question, I think, because
6   I think you're answering the question I asked you before,
7   so I'm going to try it again.
8        In that document that's under tab one, there's a
9   provision whereupon Westgate would not speak to Holiday --
10  Hospitality prior to the execution of that document.  Are
11  you aware of that?
12        A.  I don't remember that, but -- I don't remember.
13        Q.  That's fair.
14        Westgate was aware that the purchase of the
15  property was on an as is basis.  Correct?
16        A.  Yes.
17        Q.  And you used the word "hopeful" several times in
18  reference to the franchise.  Westgate was hopeful that it
19  could negotiate a franchise agreement, but it was never
20  represented to it that it actually would be approved prior
21  to executing that document on 9/24/2004.  Correct?
22        A.  Correct.
23        Q.  You know what, because of the context of this
24  case, it's sort of hard to look at your business,
25  Westgate's business, outside of this one piece of property,

## Page 15

1   for us lawyers.  I am curious to know whether this sort of
2   deal is typical for Westgate, to use a franchise to create
3   a timeshare opportunity.  Is that one business model that's
4   typically used by Westgate?
5        A.  It has been used by Westgate.
6        Q.  And when you said you were hopeful, you were
7   hopeful to use the Holiday Inn brand to develop this
8   timeshare property.  Correct?
9        A.  No.  We were hopeful to keep the Holiday Inn
10  franchise attached to the unit that we would leave as hotel
11  unit, and not have Holiday Inn be part of the timeshare
12  unit specifically.
13        Q.  Okay.  But originally, the business plan for this
14  property, prior to executing or I should say upon execution
15  on 9/24/2004, that document, the original idea was that you
16  would use the Holiday Inn brand to assist with marketing
17  the timeshare portion of this project.  Correct?
18        A.  It's difficult for me to answer that question
19  because I'm not exactly sure I understand it.
20        Q.  You don't need to say anymore because I'll try to
21  break it down.
22        A.  Please.
23        Q.  Anytime you don't -- there's two things I normally
24  tell people that I didn't tell you because you're such an
25  experienced deponent.

## Page 16

1        Number one, if you want to take a break at any
2   time, this is not an endurance contest.  We'll just take a
3   break.  I might ask you to go ahead and answer the
4   question.
5        The second thing is, and I don't like to even -- I
6   don't like to blind side even really experienced people.
7   You need to tell me if you don't understand my question
8   because I'm not a mind reader.  Even grimaces or confused
9   looks don't necessarily communicate to me that you don't
10  get what I'm asking you.
11        If you want a question rephrased or repeated, if
12  you're day dreaming because this is a boring process to
13  you -- and I don't mean that, but for whatever reason
14  you're distracted and you want a question asked again, tell
15  me and I'll do it.  I may ask you the same question, but at
16  least you're alerting me that you didn't understand the
17  question and you need it broken down.
18        The counterpoint to that is if you don't tell me
19  that, I have to rely on the fact that you do understand my
20  question.  Is that fair?
21        A.  Absolutely.
22        Q.  And the point that I always like to make when I
23  say that is we use these depositions later on at trial or
24  other hearings and so on.  And one of the reasons it's so
25  important for you to tell me you don't understand the

4 (Pages 13 to 16)

## Page 17

1  question is if I, or another lawyer, asks you the same
2  question that we've asked you here today -- we spoke in the
3  break here about an automobile accident, which this case is
4  not one. But if you testified here today that the light
5  was red when you were sitting at the intersection, and I
6  asked you the same question or Merritt or some other lawyer
7  asked you the same question two years from now at trial and
8  you say, yeah, the light was green, I don't want the change
9  in your answer to be because you really didn't fully
10  understand the question. Because sometimes people will
11  say, well, I just didn't understand what you were talking
12  about back then. Is that fair?
13     A. That's fair.
14     Q. So back to my question. I want to talk to you
15  about why it was that Westgate was interested in this
16  property, and so let me just start there with the broad
17  question.
18        What about this property intrigued Westgate enough
19  that it wanted to pay $18 million for it?
20     A. We're interested in the Myrtle Beach market
21  specifically. It was an oceanfront property, had 700-ish
22  feet along the ocean, and we felt it could be a good
23  project for us to turn into and convert into a timeshare.
24  It also had some vacant land that we could do some
25  expansion on. So it fit into our business model.

## Page 18

1        Additionally, we liked the idea of it being a
2  Holiday Inn. We have -- you had asked me a question
3  earlier, and I gave you a very short answer, but I'll give
4  you a bit longer answer now.
5        We've had and have currently a relationship
6  with -- then with Cendant; now it's Wyndham Worldwide -- to
7  have a Ramada Inn on 192 here in Orlando which has a
8  timeshare component to it. It has a Ramada Inn in the back
9  portion, and it has a Ramada Plaza Tower up front. It's
10  500 units. 147 are Ramada Plaza and 353 are Ramada Inn.
11        We negotiated with Ramada to take the 147 Ramada
12  Plaza units, and as we sold them, reduce them from the
13  franchise agreement, and the 353 Ramada Inn units would
14  always stay a Ramada Inn.
15        Knowing that, and knowing that this Holiday Inn
16  has a very good name, it had been on that property for a
17  long time, we saw that as being a benefit also to buying
18  this property, and hopeful that we could enter into an
19  agreement.
20        And I keep using "hopeful" because that is what we
21  were, and we also knew that someone we had done business
22  with before where we had a timeshare in South Florida, in
23  Miami, Sunny Isles, a guy by the name of Dr. Bob Cornfeld;
24  he had a Holiday Inn on his Newport Beach Hotel, and we
25  were selling timeshare there.

## Page 19

1        So all of that -- very long answer, but all of
2  those things together went into our, you know, thoughts and
3  our own financial due diligence of whether we would want to
4  move forward with buying this property.
5     Q. And when you move forward with a project like
6  this, does Westgate have a person that would be in charge
7  of looking for new properties and proposing them with an
8  internal committee for consideration?
9     A. Well, at the end of the day, one of the beauties
10  of Westgate is we're a committee of one, and that's David
11  Siegel. But there are two individuals within the company
12  who really were the ones who would go out and look for
13  property. One would be Mark Waltrip, and he was more on
14  the individual property side. And then when it came to
15  buying companies, and occasionally an individual property,
16  it would be me. This was one that Mark Waltrip was heading
17  up.
18        And we would then sit together -- Mark, myself,
19  David, possibly our CFO -- and discuss whether it was a
20  good venture to go forward or not.
21     Q. Okay. One of the attributes, positive attributes
22  about there being an existing hotel franchise on the
23  property is it does bring foot traffic to which you can
24  market the timeshare idea. Correct?
25     A. That is correct.

## Page 20

1     Q. And you knew at the time that Holiday Inn was the
2  largest hotel chain in the world. Correct?
3     A. That is correct.
4     Q. It's got the largest worldwide reservations center
5  of anyone in the world. Correct?
6     A. Correct.
7     Q. And so for that reason, it would be a good
8  marketing source for the timeshare component of this
9  property. Correct?
10     A. Yes. And the component that it would be very
11  beneficial for is the units that we would leave as a hotel,
12  we made a decision that we would want to keep a flag on or
13  a franchise on. Holiday Inn had a history there. They
14  already had some customer base. Those are very strong
15  things.
16        Myrtle Beach is a market where people seem to like
17  to go to the same place year after year, very consistent.
18  And there was a benefit for filling our hotel rooms, and
19  the individuals who would be in the hotel room or would be
20  staying in the hotel, we would have a booth in the lobby
21  that we would offer to sell tickets to some of the
22  attractions or discounted restaurant vouchers or things
23  like that. And they might, instead of selling them, I may
24  give them something for free to take a 90-minute
25  presentation and see our timeshare unit.

5 (Pages 17 to 20)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Westgate v. Holiday Hospitality

David Crabtree  May 17, 2010

Page 21

1    So the filling of those rooms through a franchise
2  would help me out on marketing the timeshare.
3    Q.  Okay.  And that's one of the reasons you were
4  willing to pay the liquidated damages sum, $1.2 million,
5  something like that?
6    A.  "Ish."  1.2 million-ish and some change, I think.
7    Q.  I've called it a sunk cost, but it's spent.  And
8  all you have at that point is a hope that you're going to
9  get a long-term franchise.  Correct?
10    A.  That is correct.
11    Q.  And I want to go back to this idea about how
12  properties are identified.  Is there -- is there a written
13  business plan or proposal or a form that Mr. Siegel uses
14  that you put together for a presentation?
15    A.  There's one-page spreadsheet that we typically put
16  together.
17    Q.  Okay.  And underlying that, do you have a business
18  plan that you've worked up?
19    A.  Not really.
20    Q.  Okay.  Do you make an effort to project profits?
21    A.  Typically.
22    Q.  And who would do the actual math on that?  Would
23  you and Mark Waltrip be doing that?
24    A.  From a very high level we would, and then we would
25  have, typically, sometimes, sometimes not, one of our

Page 22

1  accountants help us with it.
2    Q.  Okay.
3    A.  The distinction would be whether or not we needed
4  the support to get a loan from one of our banks.
5    Q.  Now, at the time that you entered into the
6  9/24/2004 purchase agreement, the idea, the hope was to
7  obtain a long-term ten-year franchise agreement.  Correct?
8    A.  That is correct.
9    Q.  During the time that the Holiday Inn franchise
10  actually operated on the property out there, did this plan,
11  that is, that you could use, you could leverage Holiday Inn
12  and its central reservation system to get foot traffic and
13  sell timeshares on the property, during the time that you
14  had a Holiday Inn flag there, so to speak, did it work?
15    A.  I don't think I ever said that I had a plan
16  exactly the way you just described it.  I think a little
17  bit of that is maybe you're creating a question out of bits
18  and pieces of my answers.  So please, if you could, could
19  you rephrase the question --
20    Q.  Sure.
21    A.  -- more succinctly?
22    Q.  Yes.  Well, I've got to have some building blocks.
23  You said earlier that you were interested in the Holiday
24  Inn brand because it's the number one hotel in the world,
25  largest centralized reservations system.  Correct?

Page 23

1    A.  That's correct.
2    Q.  And what that does for you, in part, is it allows
3  you to get foot traffic to build out the timeshare piece.
4  Is that correct?
5    A.  That is correct.
6    Q.  All right.  And my question for you is, is it fair
7  to say that was at least part of the plan when you
8  entered into the decision to purchase this property?
9    A.  It was part of the plan, but I would not be able
10  to sell the whole facility or the units we dedicated for
11  timeshare just out of the hotel.
12    Q.  Fair enough.  Now I think we've got common ground.
13    A.  Yes.
14    Q.  My question is, as to that part of the plan, just
15  relating to my client, Holiday Inn, you, because you had --
16  you had two hopes.  You hoped to get a long-term deal with
17  Holiday Inn and to use that, in part, to facilitate the
18  timeshare deal, the timeshare plan.  Fair enough?
19    A.  Fair enough.
20    Q.  How did that work out for Westgate?
21    A.  During the peak times of the year, it worked out
22  very well.  I wish it had generated more business during
23  the off season, but I don't think that is as much a Holiday
24  Inn issue as it is a Myrtle Beach issue.
25    Q.  Okay.  So the idea in the beginning is that you're

Page 24

1  going to derive revenue from this relationship with Holiday
2  Inn.  Correct?
3    A.  I'm going to generate revenue having a franchise
4  on the property that would help support the operation.
5  That is correct.
6    Q.  And that, that hope, that part of the business
7  plan, turned out to work well -- or I want you to use your
8  word; work how during the time that it was in existence?
9    A.  Well, again, it worked out for us during the peak
10  times of the year, but not as well as I wish it would have
11  during the off-season.
12    Q.  Okay, but you certainly got something out of
13  having the Holiday Inn flag there.  Correct?
14    A.  Yes.  We received reservations through Holiday
15  Inn.
16    Q.  And your long-term goal was to get a ten-year
17  franchise agreement.  Correct?
18    A.  That's correct.
19    Q.  And in fact, you were approved for a ten-year
20  franchise agreement.  Correct?
21    A.  I became aware of the fact that we were approved
22  for a ten-year franchise agreement within the last
23  72 hours.  Prior to that, I had no knowledge of that.
24    Q.  Okay.  So the answer to my question would be yes.
25  Correct?

6 (Pages 21 to 24)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 25

1    A.  Not during the time we had a temporary license.
2    Q.  I'll ask my question again.
3        You would agree with me that in June of 2006, you
4    were approved for a ten-year franchise agreement.  Correct?
5    A.  I did not know that.
6    Q.  Not my question.
7        My question is, I mean, you come to this
8    deposition.  In a 30(b)(6) deposition, you are designated
9    and you are required to educate yourself and come to an
10   understanding of things.
11       You are going to assimilate the body of knowledge
12   within Westgate on the areas in which you are a designee.
13   Do you understand that?
14   A.  A hundred percent.
15   Q.  And so as a function of that, you are going to
16   learn things, unless you're omniscient, typically in the
17   process of getting prepared.  And I am hearing you say that
18   this is one item that you didn't have firsthand knowledge
19   of at the time, but you now know about it.  Correct?
20   A.  This is something that my company knew nothing
21   about until the discovery process of this lawsuit.
22   Q.  Okay.  Now you know of this fact.  Correct?
23   A.  I don't know if it's a fact because I don't know
24   if it was delivered to me.
25   Q.  That's a different question, and I'll ask you

Page 26

1    about that.
2        But as you sit here today, you're aware that
3    Westgate was approved for a ten-year franchise agreement.
4    Correct?
5    A.  I saw, in May of 2010, a letter stating that we
6    were approved for a ten-year franchise agreement and no one
7    in my company saw it ever before that time.
8    Q.  Okay.  So the answer to my question is yes.
9    Correct?
10   A.  With my -- with my caveat, yes.
11   Q.  So I'm going to ask you again because we're
12   getting jumbled up with caveats, but you're free to explain
13   your answers.
14       You are aware, sitting here today, that Westgate
15   was, in fact, approved in June of 2006 for a ten-year
16   franchise agreement.  Correct?
17   A.  I've seen a letter that states that.
18   Q.  Are you disagreeing with me?
19   A.  I am not.  I'm trying to be as honest as possible,
20   but I can't agree that I knew in June of 2006 or July
21   of 2006, and I truly understand what you're trying to get
22   me to answer, and the purpose and the reason why you're
23   trying to get me to answer it.  And I'm not going to give
24   that you answer because it can be used out of context
25   against our company.

Page 27

1    Q.  Right.  It can be used in context against your
2    company as well.  Correct?
3        I'll try breaking it down so we're not bickering
4    about it.
5    A.  I'm not trying to be -- I am truly not trying to
6    be difficult with you.  I don't -- I purposely never try to
7    be difficult in depositions because I'm just trying to
8    answer the questions and give the facts.
9    Q.  So I'm going to work backwards this time --
10   A.  Okay.
11   Q.  -- and allow you a chance to refine this, but it's
12   important that we cover this question, because I think it's
13   a fair question and I think it's something that somebody
14   would require be answered.
15       Working backwards, as to a June, 2006, approval of
16   a long-term, ten-year franchise agreement, it is Westgate's
17   position that no such approval, if made, was communicated
18   to it.  Correct?
19   A.  That is correct, until the discovery process of
20   this litigation.
21   Q.  It was not communicated contemporaneous.
22   A.  Correct.
23   Q.  Do you know whether it was communicated to any
24   agent of Westgate?
25   A.  Not that I'm aware of.

Page 28

1    Q.  I want to make sure of that.  That answer doesn't
2    read well.
3        Do you know, yes or no, whether it was
4    communicated to any agent of Westgate contemporaneously?
5    A.  No.
6    Q.  Can you disavow that it may have been communicated
7    to Robert Jackson contemporaneously?
8    A.  I can't answer for Robert Jackson.
9    Q.  You've not sought to determine whether or not it
10   was communicated to Robert Jackson.
11   A.  I have not.
12   Q.  So when you say affirmatively that it was not
13   communicated to anyone at Westgate, you don't intend to
14   extend that to Westgate's lawyers.
15   A.  I was talking about employees of Westgate.
16   Q.  Okay.  As to the actual approval, and that's where
17   we got sideways, do you have any reason to contest that the
18   approval was actually made in June of 2006 within the walls
19   of my client?
20   A.  I have -- I can't -- I don't know what happened in
21   the walls, as you put of it, of your client.
22   Q.  So it very well may have gone through the approval
23   process, been formally approved, and not communicated
24   through to Westgate.  Correct?
25   A.  Correct.

7 (Pages 25 to 28)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Westgate v. Holiday Hospitality

David Crabtree  May 17, 2010

Page 29

1    Q.  You can't contend one way or the other.
2    A.  I cannot.
3    Q.  And you're aware of the approval process within my
4  client, generally.
5    A.  Very general, on a very general basis, yes.
6    Q.  But you became aware that there was a formal
7  review process that met periodically.  There was a
8  presentation, and then during that -- and during that
9  process, you were not approved until you were formally
10  approved.  Correct?
11    A.  I'm aware of that.
12    Q.  Okay.  And you had dealt with that with temporary
13  licenses.  Correct?
14    A.  That's correct.
15    Q.  Now, all the time that a Holiday Inn franchise
16  operated on that property, it was under a written temporary
17  license.  Correct?
18    A.  That is correct.
19    Q.  And all of those licenses were finite.  Correct?
20    A.  Correct.
21    Q.  They all were going to expire in a short period of
22  time.
23    A.  Correct.
24    Q.  And I'm using a short period.  Some of them were 30
25  days, some of them were 90 days, some were six months.

Page 30

1  Correct?
2    A.  I was just going to say the same thing.  Yes.  It
3  had different time frames, but it was always for a short
4  period of time.  Short being less than a year, in my mind.
5    Q.  And so, during the entire time that there was a
6  Holiday Inn flag on this property -- is that a fair way to
7  say that?  Obviously, I picked up on your word "flag," that
8  you wanted a Holiday Inn flag there.
9    A.  That's fine.
10    Q.  For the whole time -- and meaning, so if the jury
11  reads this later on, when I say Holiday Inn flag, I am
12  intending to mean that you were actually operating a
13  Holiday Inn hotel on the property.  Fair enough?
14    A.  That's fair.
15    Q.  During the entire time that there was a Holiday
16  Inn flag on the property, Westgate had not been assured of
17  any long-term deal.  Correct?
18    A.  That is correct.
19    Q.  It was always a hope.
20    A.  It was definitely a hope, and we were negotiating.
21  And the reason we entered into the monthly extensions on
22  both sides is because we believed we were negotiating in
23  good faith on both sides to hopefully enter into a ten-year
24  agreement.
25    Q.  Who pulled the plug on the negotiations over the

Page 31

1  long-term deal?
2    A.  I believe we had received notice from Holiday Inn.
3    Q.  Okay.  You believe it was from Holiday Inn's side
4  and not Westgate's side.
5    A.  I do.
6    Q.  It was Westgate's hope still, when the plug was
7  pulled, to continue negotiations towards a long-term deal.
8  Correct?
9    A.  Correct.
10    Q.  Do you know why the plug was pulled?
11    A.  I don't know exactly why it was not approved by
12  Holiday Inn.  I just know that they elected to not move
13  forward, and then we worked very well together on -- I'm
14  just very crude -- deflagging the property.
15    Q.  Let me ask you to turn to a document.  Bear with
16  me just a moment.
17    MR. ABNEY:  21.  21 and 22.
18  BY MR. FARRIER:
19    Q.  Look at tabs 21 and 22, and take a minute and just
20  familiarize yourself with those.  We're going to go off the
21  record for just a second.
22    (A luncheon recess was taken from 12:21 p.m. until
23  1:00 p.m.)
24  BY MR. FARRIER:
25    Q.  Let's start talking about the time period of the

Page 32

1  second half of 2006.
2    A.  Okay.
3    Q.  June to December of 2006.
4    During this time period, were you the person
5  primarily responsible for Westgate's negotiations with my
6  client?
7    A.  Between myself, Richard Moore, and Rob Jackson
8  from our legal side.
9    Q.  Okay.  I'd like to go through a few documents and
10  talk to you really about this issue of the approval and the
11  context of the approval and any knowledge that you had
12  gleaned about that, sort of taking off from where we were
13  before.
14    Before lunch, we learned from your testimony that
15  Westgate was unaware of any approval that had been made
16  within the walls of my client.  Correct?
17    A.  That is correct.
18    Q.  And I want to talk about the communications going
19  on back and forth between -- between you, Westgate, and my
20  client that is occurring at this time.  And the first thing
21  I'd like to look at is under tab 21 of Exhibit No. 2.
22    A.  Yes.  I am here.
23    Q.  And you will see this purports to be an e-mail in
24  which a timeshare addendum is being provided by Charlie
25  Brown -- Broun, excuse me, to Rob Jackson.

8 (Pages 29 to 32)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Westgate v. Holiday Hospitality

David Crabtree  May 17, 2010

## Page 33

1       Is it Robert or Rob?
2    A. Either one is fine.
3    Q. Rob is your attorney at the time. Correct?
4    A. That's correct.
5    Q. And you will see the attached addendum. Have you
6 ever see these documents before?
7    A. I believe I remember seeing them.
8    Q. Okay. And that's always sometimes a confusing
9 question. Had you seen them prior to your preparation for
10 this deposition?
11    A. I have not seen them in -- I believe I remember
12 seeing them, but the last time I would have seen them would
13 have been in mid-2006.
14    Q. Okay. Fair enough. That's what I was trying to
15 clear up.
16    A. Yes.
17    Q. Do you recall the negotiations of this addendum?
18    A. I remember having conversations about -- I mean,
19 it's very -- about this specific document or about all the
20 negotiations?
21    Q. An addendum.
22    A. I remember having conversations with Holiday Inn
23 about how would the license work related to timeshare.
24    Q. Now, I want to tell you that from my client's
25 perspective, the context of what's going on here is an

## Page 34

1 approval had been issued, and I'm not asking you to agree
2 with that, but an approval had been issued contingent on
3 one thing, and that's negotiation of a timeshare addendum.
4    A. Okay.
5    Q. That's my client's position.
6    Do you have any recollection of an understanding
7 in principle being reached short of an actual approval on a
8 long-term license deal, contingent on the negotiation out
9 of this addendum?
10    A. I remember that we were having conversations of
11 how we were going to do the addendum and carve or have the
12 -- how the timeshare would work with that. I don't
13 remember it being that -- I don't know that being attached
14 to, hey, this is the approval as long as we have this
15 addendum. I don't -- that's your question, I believe, and
16 I don't remember that.
17    Q. And I want to drill down on that a little bit and
18 get away from the word "approval" because we've covered
19 approval.
20    A. Okay.
21    Q. And I understand your position on that.
22    What I really want to talk to you about now is
23 your mind set as of the last six months of 2006, because
24 for the past two years, you've been trying to pull a deal
25 together on a long-term franchise agreement. Correct?

## Page 35

1    A. That is correct.
2    Q. And that's remains a goal of yours. Correct?
3    A. That's the whole goal of the relationship with
4 Holiday Inn.
5    Q. Okay. And was there a sense, in 2006, that we got
6 it but for the negotiation out of this timeshare addendum?
7    A. We believed that we were in a position that we
8 were going to be approved as long as we had an agreement on
9 how the timeshare would work in the franchise agreement.
10    Q. Okay. So at that point in time, it was a little
11 bit stronger than a hope. I'm characterizing it that you
12 felt like things were getting close.
13    A. Just so I can clarify, when I was talking about
14 the hope, that was related to the purchase of the property.
15 Once we closed on the property and I had a conversation
16 with Cathy Pitchford and Rob -- it was the three of us, I
17 remember, because I was in Vegas. And she requested to
18 have a deposit put up for the approval process, I guess.
19    Q. Is that the application fee?
20    A. Yes. Application fee, correct.
21    Q. Okay.
22    A. At that point, and then as the negotiations went
23 on, the hope started becoming more of, you know, we're
24 negotiating in good faith, and we believed both sides were,
25 that we were going to come to an agreement.

## Page 36

1    Q. Okay.
2    A. So the hope started going to more that we thought
3 an agreement would imminent.
4    Q. But your position is at no time did my client ever
5 give you assurances or promises that it had been approved
6 or would be approved. Is that correct?
7    A. I never had assurance that, a hundred percent, it
8 was going to be approved. That is correct.
9    Q. You were still negotiating.
10    A. I believe we were always negotiating. Thinking we
11 were getting closer, but always negotiating.
12    Q. Okay. So what I want to do is sort of look at
13 these documents.
14    Do you recall seeing this actual e-mail before
15 that's under tab 21?
16    A. I don't recall seeing that e-mail.
17    Q. Look at tab 22 of Exhibit 2.
18    A. Okay.
19    Q. This is a document from Elisa Adams to you.
20    A. Okay.
21    Q. Would you agree that this is an accurate copy of
22 an e-mail sent by Elisa to you as of the date and time
23 indicated here?
24    A. Yeah. I mean it shows me, David, Dave Crabtree
25 from Westgate, and it shows it's from Elisa Adams.

9 (Pages 33 to 36)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 37

1  Q.  Okay.  And so on July 12, 2006, Elisa Adams from
2  IGH, my client, in essence, Holiday Inn, is saying what to
3  you?
4  A.  "Our legal counsel would like to resolve the
5  timeshare portion addendum portion prior to issuing the
6  license.  He sent the attached document to your counsel
7  yesterday."
8  Q.  Okay.  If you'll look at that, I'll tell you that
9  it should be the exact same document that's attached under
10  tab number one, the attachment is.
11  A.  Okay.
12  Q.  This is a proposal from my client as to what the
13  addendum might look like.  Do you understand that?
14  A.  Correct.
15  Q.  And obviously, you were aware that we had made
16  this proposal at the time.  Correct?
17  A.  Again, I didn't remember seeing that specific
18  e-mail, I don't remember it, but I did remember that Rob
19  and I had talked about the addendum and, you know, how we
20  were going to have the timeshare portion work.
21  Q.  Okay.  And again, your feeling as of July 12, 2006
22  is that if we can get this addendum worked out, we probably
23  have a deal.
24  A.  I believe that we were working -- we were working
25  jointly, Holiday Inn and Westgate, to get to a ten-year

Page 38

1  agreement.
2  Q.  And you felt like both sides were working in good
3  faith at this time.
4  A.  Yes, I did.
5  Q.  And you still feel that way.
6  A.  I still feel that at this point in time we were
7  working in good faith.
8  Q.  Do you feel like at any time either party was
9  acting in bad faith?
10  A.  Once Holiday Inn sent us notice not to renew, I
11  had a feeling -- I had a feeling that I was strung along.
12  I don't know if that means they're acting in bad faith or
13  not.  I just think that we were moving forward together,
14  and then it just ceased.
15  So something happened that ended our relationship,
16  and if I would have known it was going to be two and a half
17  years and then it was going to be over, I would not have
18  waited that long.
19  Q.  Okay.  But you don't have any evidence that you
20  were being strung along, do you?
21  A.  Not that I'm aware of.
22  Q.  And you don't have any evidence that anyone acted
23  in bad faith, do you?
24  A.  Not that I'm aware of.
25  Q.  You don't have any evidence to disprove the

Page 39

1  thought that my client wanted to close a deal with you just
2  as badly as you may have wanted to close a deal with them.
3  A.  I don't know exactly how they felt.  But at the
4  point in time we were moving forward, I believed we were
5  both moving forward with the idea of entering into a
6  long-term agreement.
7  Q.  Okay.  And that was as long as you were
8  negotiating.  Correct?
9  A.  Correct.
10  Q.  Look at the next tab under tab 23.
11  A.  Sure.
12  Q.  And let me ask you, it's two e-mails, a string of
13  e-mails, and the second e-mail is Elisa Adams writing to
14  you, and then a response from you to her on August 3, 2006.
15  A.  Yep.
16  Q.  And then the e-mail goes internal, to my client --
17  A.  Yep.
18  Q.  -- because we see Tidwell to Adams and then Adams
19  to Charlie Broun.
20  At least as to the portion that you seem to be
21  identified with, would you agree that this is an accurate
22  copy of an exchange of e-mails sent by or from you as of
23  the dates and times indicated?
24  A.  I believe so.
25  Q.  So now we're in August of 2006, and you're taking

Page 40

1  the addendum, and presumably that's the addendum we just
2  looked at, and you're going to send it over to Rob Jackson.
3  Correct?
4  A.  I was going to discuss it with Rob.
5  Q.  Okay.  And do you recall -- I'm not asking you at
6  this time what was discussed, but do you recall discussing
7  it with Rob Jackson?
8  A.  I mean, I remember having a conversation with Rob
9  on it.  And I said in my e-mail I was going to have it done
10  Tuesday.  If I give them a specific date, I usually live up
11  to my dates.
12  Q.  Okay.  And if you'll look at the one that you're
13  not copied on, "This is the last response I received."
14  This is dated August 31st.
15  A.  Yes.
16  Q.  So the month of August has apparently been silent,
17  at least from my client's perspective.  And you'll see that
18  it appears, at least, that my client is trying to move
19  forward, towards closure.  Correct?
20  A.  That's what it appears in these e-mails, yes.
21  Q.  Look at the next e-mail.
22  A.  Okay.
23  Q.  This is an e-mail that you're not copied on, and I
24  assume that you have not seen this document prior to
25  getting prepared for this deposition.

10 (Pages 37 to 40)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

## Page 41

1     A.  Are you talking about number 24?
2     Q.  24, yes.  Thank you.
3     A.  I haven't.  I have never seen this one.
4     Q.  Okay.  What I want to ask you about is the
5  substance of some statement in here, and you'll see in the
6  middle it says -- this is from Robert Jackson.  And he
7  says, "I was out of the office last week and am out
8  Thursday and Friday..." and then it says "David Crabtree
9  has been involved with a large securities trial and then
10  another matter which both appear to be concluded.  I hope
11  to meet with him tomorrow or Wednesday."
12     And this is in response to Charlie Broun, see
13  below, "Robert, what is going on?"  We have no signed
14  extension and no further contact.
15     All right.  I've read some to you.
16     A.  Okay.
17     Q.  But in the first instance, you would agree with me
18  that it appears that my client is continuing to try to push
19  closure.  Correct?
20     A.  I believe so, yes.
21     Q.  And Mr. Jackson provides a response, an excuse for
22  the delay, which involves both his schedule and yours.  And
23  do you recall being involved in a large securities trial
24  and otherwise occupied at this time?
25     A.  Yes.

## Page 42

1     Q.  Okay.  And what was that about?
2        MS. CHAPMAN:  Object.  I'm going to object to
3  form, but you can answer.
4  BY MR. FARRIER:
5     Q.  Okay.  Well, I'll ask it better.  Where was that
6  case pending?
7     A.  Here.
8     Q.  In Orlando?
9     A.  In Florida.
10     Q.  In Federal court?
11     A.  Yeah, but down south.
12     Q.  All right.  And were you managing the case for
13  Westgate?
14     A.  I was a key witness in the case.
15     Q.  And it took you out of the office for some period
16  of time?
17     A.  Yes.
18     Q.  All right.  When you were out, did you pass the
19  baton on this project to anyone else at Westgate?
20     A.  No.
21     Q.  Look at the next document that's under tab 25 --
22     A.  Okay.
23     Q.  -- of Exhibit No. 2.
24     A.  Okay.
25     Q.  And let me first ask if you have seen this

## Page 43

1  document before.
2     A.  This is the document that I saw for the first time
3  within the last 72 hours.
4     Q.  And so this is the document that gave you notice
5  that my client's position was that we had approved the
6  license application.
7     A.  That's what this stated in this document, yes.
8     Q.  Did you ask Richard Moore if he had ever seen this
9  document?
10     A.  I did.
11     Q.  You did?
12     A.  I did.
13     Q.  And what did he say?
14     A.  No.
15     Q.  Do you have any reason to believe it's a
16  contrivance?
17     A.  Explain.
18     Q.  Well, my cohort here and I just finished a
19  securities trial where the other side had a habit of
20  creating letters to themselves from mysterious third
21  parties that did not actually exist, signing on behalf of
22  John Doe, and mailing the letter to himself to try to
23  create facts that did not otherwise exist in a large Ponzi
24  scheme.
25     A.  Okay.

## Page 44

1     Q.  That's what we mean by a contrivance.  And I'll be
2  specific as to this letter.
3     Do you have any reason to believe that Elisa Adams
4  did not draft this letter and mail it to Richard Moore on
5  November 16, 2006?
6     A.  I have no reason to believe that she did not do
7  that.  I can only say that Richard Moore never received it.
8  And the only reason I'm certain about that is because
9  Richard Moore sends me everything he receives when it's
10  related to things he and I are working on together, and I
11  never saw it.
12     Q.  Okay.  Is the address on this letter accurate?
13     A.  Yes.
14     Q.  And it was accurate as of the time?
15     A.  Yes.
16     Q.  And to your knowledge, is the Robert Jackson
17  address correct?
18     A.  Yes.
19     Q.  All right. Have you asked --
20     A.  I just want to add, I don't believe she
21  maliciously is creating letters --
22     Q.  Okay.
23     A.  -- personally.
24        MR. LENOX:  Can I ask a question?  Do you all have
25  the courier information on this?  It says via overnight

11 (Pages 41 to 44)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Westgate v. Holiday Hospitality

David Crabtree  May 17, 2010

Page 45

1     courier.  Is there some kind of delivery receipt?
2        MR. FARRIER:  I don't know the answer to that.
3     It's a good question.
4        THE WITNESS:  I'm not sure if the fax number is
5     correct.  I remember most numbers.  Fax numbers are the
6     ones I don't remember.
7     BY MR. FARRIER:
8        Q.  They're becoming dinosaurs.
9        A.  You're correct, because you can scan everything
10    and e-mail.
11       Q.  Let me ask you to flip to the next page.
12       A.  Okay.
13       Q.  I meant to ask you a question.
14          Have you asked Mr. Jackson whether or not this
15    document -- this is a very close question.  Have you asked
16    Mr. Jackson, have you inquired whether this document exists
17    in his file?
18       A.  When you say this document, are you talking about
19    tab 25?
20       Q.  Yes, 25, this letter dated November 16, 2006.
21       A.  I have not had a conversation with Rob Jackson
22    about this.
23       Q.  Okay.  Let me ask that question in a different
24    way.  Is there, and I will say this just in advance for
25    your benefit, to the extent -- and I don't know, I don't

Page 46

1     think this breaches the attorney/client privilege, but to
2     the extent it does by your answering it, I do not intend it
3     to be a waiver, because I think it's a question of fact
4     whether a document exists, whether it reached a file.
5          But have you made inquiry of Greenspoon Marder as
6     to whether or not this precise letter which is under tab 25
7     exists in their files?
8        A.  I have only asked Richard Moore about this letter.
9        Q.  Okay.  Look at tab 26.
10       A.  Okay.
11       Q.  After having looked at this letter dated
12    November 21, 2006 from Mr. Jackson to Elisa Adams which is
13    found under tab 26 of Exhibit No. 2, can you confirm
14    whether or not you have seen this document before today?
15       A.  I don't remember seeing this document.
16       Q.  Okay.  Now this, tab 25, appears to refer to --
17    excuse me.  Tab 26 appears to refer back to the
18    November 16th letter on tab 25.  Correct?
19       A.  Correct.
20       Q.  I mean, we can't say that for sure, but
21    contextually, it seems to be a direct reference to the
22    November 16th letter under tab 25 because of his reference
23    back to the termination.  Correct?
24       A.  Correct.
25       Q.  So did you receive a copy of this letter in your

Page 47

1     files?  Did you ever receive a copy of this letter?
2        A.  I don't remember seeing this letter.
3        Q.  Okay.  Do you see that you're carbon-copied on
4     here along with Richard Moore?
5        A.  I do.
6        Q.  And have you made any effort to see if this
7     document is contained in your files?  I guess not, because
8     you hadn't seen it before today, have you?
9        A.  Correct.
10       Q.  That you know of.
11       A.  This, right now, this letter I haven't seen in any
12    time.  You know, I told you I saw tab 25 in the last
13    72 hours.
14       Q.  Right.
15       A.  Tab 26, I don't remember ever seeing.
16       Q.  Okay.  Flip over to the next page, next tab,
17    excuse me, which is tab 27.
18       A.  Okay.
19       Q.  Now, if you look at the bottom of this e-mail,
20    there is -- there is an e-mail from Robert Jackson to Elisa
21    Adams, with a cc to Dave Crabtree and to Richard Moore,
22    apparently.  Do you see that?
23       A.  Yes.
24       Q.  To the best of your knowledge, is this a true and
25    accurate copy of an e-mail, at least this bottom portion,

Page 48

1     that was forwarded to you on or about the date indicated?
2        A.  It would appear that way.
3        Q.  Okay.  And it, too, it's sent on November 21, 2006
4     at 6:28 p.m.  Correct?
5        A.  Correct.
6        Q.  And it says please see attached letter.
7           Now, I don't really understand the c.c. to David
8     Crabtree and Elisa Adams down at the bottom.  That's just
9     an unusual placement within an e-mail.
10       A.  I agree.
11       Q.  Do you know anything about this e-mail?
12       A.  Not that I remember right now.
13       Q.  Can you recall what was attached to it on
14    November 21, 2006?
15       A.  I have no idea what was attached to it.
16       Q.  And some of these questions, I don't expect you --
17    I mean, I have to ask you, but I don't expect you to have a
18    photographic memory.
19       A.  I understand.
20       Q.  You would agree with me that it is possible that
21    it could have been the letter under tab 25.  Correct?
22       A.  I don't know if it could have been what's under
23    25.  I don't know if it could have been the addendum for
24    the franchise agreement.  I'd be speculating.  I have no
25    idea what was attached.

12 (Pages 45 to 48)

Zacco & Associates Reporting Services
407-425-6789

Page 49

1    Q.  Well, I like to ask these questions both ways.
2  You don't know what was attached, but you also can't
3  contend that it was something other than something else.
4  It could have been that November 16th letter in tab 25; it
5  could have been something else.  You just have no
6  recollection.  Correct?
7    A.  That's correct.
8    Q.  In other words, you can't refute that it might
9  have been the November 16, 2006, letter under tab 25.
10    A.  I can't tell you if it -- I can't say what it was
11  or what it was not.
12    Q.  Okay.  Well, at the top here, it says attached is
13  a fully executed extension letter; the e-mail from Robert
14  Jackson back to Charlie Brown -- Broun.
15    A.  That's funny.  Please, can we go off the record
16  for a second?
17    MR. FARRIER:  Yes.
18    (Discussion off the record.)
19  BY MR. FARRIER:
20    Q.  We're under tab 27, and you will see there is a
21  red line version of an addendum in here.
22    A.  Okay.
23    Q.  Did you ever review a red line that was created by
24  Mr. Jackson and proposed back to Westgate -- proposed back
25  to my client by Westgate?

Page 50

1    A.  Any red line that Rob would have done, I would
2  have been involved in from the company's perspective.
3    Q.  This is a difficult thing to do live, and we may
4  wait and just take a break, but can you flip through this
5  and see if it's something you've seen before?  It's very
6  hard to do because it's an evolving negotiation, I know.
7    Actually, I think the easiest way for me to do
8  this is I am going to point you to some pages of it by the
9  Bates labels.  And you're familiar with Bates labels.
10  Right?
11    A.  Yes, I am.
12    Q.  If you will go over to 1070, under Paragraph 6.
13    A.  Yes.
14    Q.  You will see language that removes from the
15  license and fee, any units that are devoted to the
16  timeshare.
17    A.  Correct.
18    Q.  Okay.  And if you look on the next page, 1071, at
19  the bottom of the page, the carry over paragraph.
20    A.  Yes.
21    Q.  You will see that there is a two-year opt out, a
22  unilateral termination provision on behalf of your client.
23  Do you see that?
24    A.  Yes.
25    Q.  And if you flip over to 1075, you would agree with

Page 51

1  me that these underlined portions appear to be changes
2  suggested by Westgate through its attorney to my client.
3  Correct?
4    A.  Correct.
5    Q.  So this would be new language that -- it appears
6  it's new language proposed by Mr. Jackson.  Correct?
7    A.  Proposed by Westgate through Rob.
8    Q.  Okay.  And you will see that under paragraph number
9  three on 1075 there is a proposal that there is going to be
10  established a in-house call program.
11    A.  Yes.
12    Q.  And flip over to 1080.  That's a long paragraph,
13  so if you need some time to look at it, Westgate is also
14  now proposing in this draft a cure requirement for any
15  default that occurs under the license agreement, or at
16  least the addendum.
17    A.  Okay.
18    Q.  Would you agree with me that these changes would
19  be substantive changes to a long-term franchise agreement,
20  that are being proposed?
21    A.  I would agree they are changes that we would want,
22  but I wouldn't draw a line in the sand over any of them,
23  meaning they weren't deal breakers from Westgate's
24  perspective.
25    Q.  Okay.  After looking at this string of exhibits,

Page 52

1  is it possible that there was a complete misunderstanding
2  between Westgate and my client about where we were in
3  negotiations?
4    A.  It's hard for me to say where they were.  I don't
5  think there was a misunderstanding from our perspective.
6  The way I recall it, we were signing extensions because we
7  believed we were getting to an end, and the end being
8  signing a ten-year deal.
9    Q.  Okay.
10    A.  So I don't know if there was a misunderstanding on
11  that front.
12    Q.  All right.  Let me ask that question in a slightly
13  different way, and you may have seen this from pleadings or
14  you may have gleaned it from my questioning.
15    Do you understand that my client's position is
16  that they worked for two years to try to come to an
17  agreement on a ten-year franchise agreement, and
18  ultimately, in June of 2006, they approved your
19  application.  Do you understand that that's our position?
20    A.  I understand that's your position, yes.
21    Q.  And do you understand that the last item, at least
22  in my client's mind, was the negotiation of this agreement,
23  and that is the addendum.  Do you understand that?
24    A.  From what you have shown me from the letter and
25  the internal e-mails, yes, I do understand that.

13 (Pages 49 to 52)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 53

1    Q.  And that, in fact, any lagging, at least by
2  looking at these documents that was occurring during this
3  period of time, the second half of 2006, appears to have
4  been on the part of Westgate rather than by my client.
5  Correct?
6    A.  It looked like we had some things that slowed down
7  the process, yes.
8    Q.  So you would agree with me.  Correct?
9    A.  I agree with you.
10    Q.  And you would agree with me that these series of
11  exhibits that I have shown from you tab 21 through tab 27
12  are supportive of our position in the case.  Correct?
13    MS. CHAPMAN:  Object to form.  You can answer, if
14  you can.
15    THE WITNESS:  If you want to be a little clearer
16  on it, you'll make it so it's easier for me to answer.
17    MR. FARRIER:  I was waiting for an objection to
18  occur, because there's an objection speech I always
19  like to make to people.
20    THE WITNESS:  Okay.
21    MR. FARRIER:  In federal court, the role of
22  attorney is very limited, and I said this early on.
23  And so when your attorney makes an objection, she's
24  doing it for one person's benefit, and it's mine.
25  She's trying to help me out.

Page 54

1    And I may agree or disagree with her, but unless
2  you are given an instruction by your lawyer not to
3  answer a question, she really is sort of a potted
4  plant.  I don't mean to be disparaging at all.
5    MS. CHAPMAN:  Thank you.
6    MR. FARRIER:  But she needs to note her objection
7  for the record.  I need to listen to it and consider
8  it, and either modify my question or reject it.  But
9  unless she says don't answer that, then we're just
10  rocking along, assuming I don't want to rephrase my
11  question.
12    So I will rephrase my question, since I went off
13  on a little speech, and we'll keep rocking along.
14  BY MR. FARRIER:
15    Q.  You just looked at a number of exhibits from tab
16  21 through tab 27, I believe, and you gained an
17  understanding, which you may have had before coming in here
18  of what my client's version of history was regarding these
19  negotiations.  Right?
20    A.  Correct.
21    Q.  You would agree with me that these documents we
22  just looked at don't contradict in any way the version of
23  history that my client asserts in this case.  Correct?
24    A.  Correct.
25    Q.  In fact, they support it.  Correct?

Page 55

1    MS. CHAPMAN:  Object to form.
2    THE WITNESS:  You are putting things in front of
3  me that look -- that appear to support your client's
4  position.
5  BY MR. FARRIER:
6    Q.  Absolutely.  That's my job.
7    And you would agree with me that if, in fact, in
8  June of 2006 that Westgate had been approved for a ten-year
9  license agreement, that the allegations in this case would
10  take on an entirely different flavor.  Correct?
11    MS. CHAPMAN:  Object to form.
12    MR. LENOX:  What flavor, chocolate?
13    THE WITNESS:  If in June of 2006, I knew that we
14  already had an approval and it was limited to ironing
15  out the fine details of the addendum, we would have
16  made sure we ironed them out then and we would still
17  have a Holiday Inn franchise flag on that property.
18  BY MR. FARRIER:
19    Q.  And if, in fact, that was approved and
20  communicated in some way, either directly to Westgate or
21  through your agent, then you agree with me that at least as
22  of that time, that Holiday Inn, my client, Holiday
23  Hospitality, had done all it could do to reach an agreement
24  with you.  Correct?
25    MS. CHAPMAN:  Object to form.

Page 56

1    THE WITNESS:  One thing I meant to say earlier,
2  and I'm not trying to go off on a tangent, but I think
3  it's a key point to bring up right now, is part of the
4  negotiation and us getting to an addendum and a
5  ten-year agreement, is I was going to negotiate fees,
6  royalty fees, marketing fees -- we'll just call them
7  franchise fees -- to encompass all the fees that I
8  would pay as a franchisee to a point where it would
9  allow me to recoup my liquidated damage.
10    I'm just throwing that out there, because that was
11  probably going to be the last thing that was left on
12  the table to have ironed out.  I definitely would have
13  been in a position at the table trying to finalize
14  those things to ensure -- to ensure that I was able to
15  recoup money that, in my perspective, I paid twice.
16  BY MR. FARRIER:
17    Q.  Look under tab 27, 1090.
18    A.  Okay.
19    Q.  And you will see that, in fact, not in any obtuse
20  way, but in a very direct way you've made a proposal to
21  recoup those fees, if you look at the very bottom of the
22  page under Paragraph 21.
23    A.  I'm very consistent in the way I negotiate.
24    Q.  So my point is that I need to understand more
25  about what this case is about, if in fact the facts in my

14 (Pages 53 to 56)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 57

1    client's version are indeed accurate. I need to understand
2    what the case is about, if your version is accurate and if
3    my version is accurate.
4        And I'll start out by talking about your version.
5    And when I say your version, I'm dumbing down a lot of
6    testimony that you've already talked about, but your
7    version is that you were negotiating along, and no one ever
8    -- if an approval took place, no one ever told you about
9    it. That's your version of the facts. Okay? Is that
10   fair?
11       A.  On a limited scope, yes.
12       Q.  Okay. I mean, I left out an awful lot, obviously.
13       But if that version of facts is absolutely rock
14   solid, this June letter did not go out, approval didn't --
15   it wasn't understood. If any approval was never
16   communicated, what did my client do to cause any damage to
17   your client?
18       A.  You mean to me?
19       Q.  To Westgate.
20       A.  I know. You said my client. I am the client.
21       Q.  I'm going to ask that question again.
22       What did my client do to you, yes, you, Westgate?
23       A.  The liquidated damage was an amount that was a
24   calculation to terminate the MBII franchise agreement. And
25   it was a calculation of the fees they would have received

Page 58

1    from the day of termination until the end of the term, in
2    concept. I can't remember off the top of my head the
3    specifics, but in concept.
4        So this $1.2 million-ish that they were never
5    going to see because we terminated the agreement, we paid
6    upon closing and purchasing the property.
7        Subsequent to that, we ended up entering into a
8    temporary license agreement with your client. I paid those
9    fees all over again.
10       Where's the damage to me? For two and a half
11   years, when I was paying the fee for the second time, I had
12   a couple of different options, if at the end -- if the
13   finish line I wasn't going to enter into an agreement
14   with Holiday Inn. I could have had it be an independent
15   flag and I start to build momentum that it's not the
16   Holiday Inn property of Myrtle Beach, it's the Westgate
17   Resorts property or Westgate Inn or whatever internal
18   independent quasi-flag we use.
19       So for two and a half years, the public did not
20   know about a property called Westgate, except very limited
21   to the timeshare portion of it. The 84 units, I believe it
22   is, out of the 300-ish units. That's one.
23       The second thing is I could have entered into an
24   agreement with a different flag. I already had a
25   relationship with Cendant through Ramada, who I explained

Page 59

1    earlier what our relationship was and how it worked. And I
2    could have started building momentum for the property that
3    the new identity was a Ramada Inn or something like that.
4        So again, for that two and a half years, I lost
5    the promotion and the opportunity to build a brand other
6    than the Holiday Inn.
7        And you know, I also believed that I was going to
8    be able to negotiate a fee to recoup the money that I paid
9    twice. I'm just saying from a business standpoint, I'm not
10   practicing any law in my comments whatsoever, but from a
11   business standpoint, I was hopeful to get a reduction in
12   the franchise fees, or as you pointed out in the addendum,
13   repayment of the double payments that I believe I made.
14       Q.  Okay.
15       A.  Very long-winded answer. I hope it covered your
16   -- answered your question.
17       Q.  If didn't at all. In fact, I'm going to tell you
18   where the disconnect is.
19       A.  Okay.
20       Q.  I asked you, I think, so I'm going to ask it
21   again. What I intended to ask you is what my client did,
22   and you answered with what you would have done had you
23   known how history was going to play out.
24       And so, I want to ask you again, what is it that
25   my client did to cause you damage?

Page 60

1        A.  I believe they didn't enter into a ten-year
2    agreement with me, and it cost me time.
3        Q.  Okay. I know that's what happened, and I agree
4    with you; that it is conceded that they didn't enter into a
5    ten-year agreement. It's disputed whether or not it was
6    approved, but that's a matter of fact. It's also a matter
7    of fact that time passed while that occurred.
8        But is there anything that my client did that was
9    untoward or unfair or improper during any of this period
10   that led to those two facts?
11       A.  I feel that I paid fees for the same period of
12   time twice.
13       Q.  Is there anything my client did, though?
14       A.  Besides receive the money? No.
15       Q.  And in receiving the money, you're talking about
16   the fees that were paid in the interim and the liquidated
17   damages. Correct?
18       A.  I'm talking about the liquidated damage to cover
19   that time period and then the temporary license fees. That
20   was a separate contract.
21       Q.  So let's break that down. For the liquidated
22   damages, that's the reason I asked you about sunk costs.
23   You may have hoped to get it back in some form down the
24   road, but there's nothing that my client did to create that
25   hope in your mind that you might get it back in some

15 (Pages 57 to 60)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 61

1    fashion. Correct?
2         MS. CHAPMAN: Object to form.
3         THE WITNESS: I believe that part of our
4    negotiating in good faith on both sides was I was going
5    to get to a point where I could negotiate it, but there
6    was nothing implied or agreed to by your client at any
7    point in time.
8    BY MR. FARRIER:
9         Q. Okay. That's what I'm -- that's what I'm trying
10   to establish.
11        On 9/24/2004, a decision is made by you to sink
12   liquidated damages into this investment, and that money was
13   spent not in reliance on anything my client did or didn't
14   do, but as part of a hoped-for package that you were going
15   to pull together. Correct?
16        A. Correct.
17        Q. All right. And the fees that were paid in the
18   interim from 2004, 2005 on through 2006, whenever the
19   relationship ended, my client provided the services it said
20   it was going to provide in exchange for those fees.
21   Correct?
22        A. It was from January of 2005 through May -- end of
23   May, 2007.
24        Q. Okay.
25        A. Those are the dates you're asking about. Correct?

Page 62

1         Q. Yes.
2         A. They -- they provided the reservation system and
3    reservations during that period of time that the temporary
4    license called for.
5         Q. Okay. So let me ask that another way. All the
6    while on these temporary periods, an agreement is entered
7    into on the front end, sometimes to cover a little bit of a
8    gap, but an agreement is entered into between my client and
9    you whereby my client is agreeing to do certain things to
10   keep you in the Holidex reservation system, and there's a
11   list of them in those temporary licenses. And my client
12   did those; whatever is in the license, they did those
13   things that were in the license. Correct?
14        A. Correct. The only thing I want to add is the
15   reason I kept agreeing to the extensions was with the fact,
16   the point that we were going to come to an agreement at the
17   end. Because at the same time, every time I extended, I
18   lost the ability to have a different identity for that
19   property than Holiday Inn.
20        Q. Right. There may be some very small thing out
21   there that I don't know about and I'm not trying to capture
22   it in a question like we may have owed you a set of Holiday
23   Inn napkins that were late being delivered, but by and
24   large, whatever it was that Holiday Inn was supposed to do,
25   my client was supposed to do for you for which you were

Page 63

1    paying fees, we did. Correct?
2         MS. CHAPMAN: Object to form.
3         THE WITNESS: You were delivering me the
4    reservation system called for and I was paying the
5    fees. That's correct.
6    BY MR. FARRIER:
7         Q. Okay. Another way to say that, you're not aware of
8    any substantive breach of any agreement entered into
9    actually signed and executed between my client and you.
10   Correct?
11        A. Not that I'm aware of during that period of time.
12        Q. Okay. Look at paragraph -- tab 26.
13        A. Okay.
14        Q. And there's a curious line in here, right in the
15   middle, with the sentence "Please understand that we have
16   been addressing internal development issues that have made
17   it difficult to finalize said Addendum. Fortunately, these
18   issues have been resolved and we are hopeful that we will
19   be able to finalize a long-term License which will enable
20   us to continue our relationship."
21        I guess the first question is, were there internal
22   development issues occurring within Westgate in the latter
23   part of 2006?
24        A. Great question to ask Mark Waltrip.
25        Q. Okay.

Page 64

1         A. Development here, the way I would understand it,
2    would be us trying to expand the building.
3         Q. That's not the inference I took from this, but I
4    don't argue about inference. I'm going to ask you about my
5    inference. The inference that I took was that there was a
6    problem internal to the organization at Westgate that was
7    going on, a change in leadership, a struggle for control
8    between you and Mark or something. I mean, something --
9    I'm being a little bit light, but something going on
10   internal to Westgate at this time, not specific to the
11   project, but within the business.
12        Are you aware of anything that was going on at
13   this time?
14        A. From the development standpoint, from the outside
15   looking in, it was the property development of the
16   expansion.
17        Q. Okay.
18        A. There was some issue -- I don't even want to
19   speculate what the issues are, although I will tell you two
20   things. One was the height of the building, and there are
21   some setback issues.
22        Q. Okay.
23        A. That's what I believe that's referencing.
24        Q. And what you're saying -- we're still missing each
25   other a little bit. What you're saying is all these issues

16 (Pages 61 to 64)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

## Page 65

1    were specific to the property at Myrtle Beach.  Correct?
2        A.  Correct.
3        Q.  You're not aware of any issues, systemic issues,
4    structural issues within Westgate that went beyond this
5    project that were going on at the time.
6        A.  November, 2006, there was -- we were cruising
7    along.  David Siegel owns the company.  He runs the
8    company.  There were no development -- internal executive
9    development issues going on at Westgate.
10       Q.  Okay.  If I understand, then, your overall
11   complaint, I'm going to use an analogy, and I don't mean --
12   this is not intended to be trite, but -- and I want to be
13   realistic, so if it doesn't fit, you tell me.
14           But what I hear you saying is that your real
15   problem with what happened here is that you spent a lot
16   time on something that you could have used better either
17   developing the property yourself or going with another flag
18   to go on this property.  Correct?
19       A.  Yeah, yes.
20       Q.  All right.  And to me what I hear is, to use a
21   dating analogy, it's to look back and say I just wasted the
22   last three years of my life with you when I should have
23   been and would have been -- my time would have been better
24   spent seeing somebody else.  Is that a fair analogy of what
25   really went on here?

## Page 66

1        A.  The only thing that's not fair is I wouldn't enter
2    into a contract with someone I'm dating.  I would prefer to
3    wait until before we got married, and that's when you ask
4    them for the contract.
5            MR. FARRIER:  Let's take a break.
6            (Brief recess.)
7    BY MR. FARRIER:
8        Q.  So let's return to tab 26.  There was one other
9    question I neglected to ask you about that.
10       A.  Okay.
11       Q.  If you look at the last line, the inference I draw
12   is Mr. Jackson is asking for an extension of my client.  Is
13   that a fair inference?
14       A.  Yes.
15       Q.  And I just wanted to see if I was correct in my
16   understanding that both sides proposed extensions at
17   various times to proceed with negotiations.  Correct?
18       A.  Yes.
19       Q.  So there were times when the extensions were
20   actually at the behest of you versus my client.  Correct?
21       A.  The only thing is I don't know the conversation
22   that was occurring, you know, alongside this letter.  So I
23   don't know if it was a proposal and Rob had called me and
24   said, hey, do we want to do it?
25           Typically, Richard Moore would get a copy of an

## Page 67

1    extension, send it over to me.  I would find out where we
2    were in the process, and then get Siegel to sign it.
3        Q.  And really what I'm trying to make sure of is that
4    both sides needed extensions at various times during this
5    process.  Correct?
6        A.  Correct.
7        Q.  All the extensions would have come from -- the
8    actual agreement would have been drafted by my client.
9    Correct?
10       A.  I believe so, yes.
11       Q.  The ones that were executed.
12       A.  Yes.
13       Q.  Do you know what happened to the negotiations
14   after December of 2006?
15       A.  After the red line that you just -- I guess that's
16   tab 27 --
17       Q.  Right.
18       A.  -- if I'm accurate.
19       Q.  Right.
20       A.  I'm not sure what happened after December -- I
21   mean, I don't remember what happened after December 5th,
22   which is the date that you show on this, to -- you know,
23   after that.
24       Q.  Okay.  You know, when we began this this morning,
25   you shared with me your impression that the person who

## Page 68

1    walked away from the table -- and it's not the language you
2    used -- was my client.  Is that still your understanding?
3        A.  My belief is that for two and a half years we were
4    negotiating this, and then you or -- you, as being Holiday
5    Inn, terminated going forward.
6        Q.  Okay.  Do you know what happened with the
7    proposals as contained in tab 27, the red line?
8        A.  The proposed changes?
9        Q.  Yes.
10       A.  I don't ever remember sitting down with Holiday
11   Inn and going through them one by one or having a phone
12   call where I went through them one by one with anyone on
13   the business side of Holiday Inn, so I'm not exactly sure
14   what happened in response to the red line suggestions.
15       Q.  And what I'm trying to get to, to sort of get to
16   the end of the line is, you don't know what happened after
17   this proposal, whether there were additional proposals or
18   additional discussions over these proposed changes.
19       A.  I don't remember sitting here right now.  It
20   doesn't mean that if you didn't show me that there was
21   another proposal, it couldn't jar my memory, but sitting
22   here now, I don't remember.
23       Q.  Okay.  Just so we're clear, I'm not ready to pull
24   the next document out of my hat.  This is the last document
25   that I have that evidences any negotiations, but that

17 (Pages 65 to 68)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 69

1  doesn't mean it's the end of line of negotiations. I was
2  just curious if you knew one way or the other, and you said
3  you don't.
4      A. Sitting here right now, I don't remember.
5      Q. Okay. Post termination, what happened at the
6  property?
7      A. Once we terminated -- we terminated, I think, the
8  end of May. I think it was May 31st, and then we had until
9  like the last week of June to take everything off of the
10  property that was -- that had Holiday Inn, you know,
11  trademarks or name or anything on it. And then after that,
12  we went at it as an independent.
13      Q. Okay. Now, let me see if I understand sort of
14  what happened on the property, which I need to go to
15  because I haven't been there.
16          But originally, there was a large piece of
17  property and the original idea was that you were to take
18  out portions of the Holiday Inn hotel, floor by floor, and
19  market those as timeshares. Correct?
20      A. Not quite that way, but let me clarify.
21      Q. Uh-huh.
22      A. The property had 305-ish rooms. Some people say
23  306, some people said 304, so let's just say 305. Of that,
24  it was made up of three buildings. The third building --
25  while all connected by hallway and other things, there were

Page 70

1  three buildings because the thing was built in a couple of
2  phases.
3          The third building had 84 units of the 305-ish
4  units, and we converted those 84 units into 28 two-bedroom
5  lock-off timeshare units, which was made up of 56 keys; 28
6  times two.
7          So the concept or the thought was we would enter
8  into the long-term franchise or flag with Holiday Inn on
9  the first two buildings, and the third one we would
10  build -- we would convert as timeshare, which we did.
11          Additionally, we were going to expand the property
12  because we had the space, land, and then we had to figure
13  out what we were going to do with parking. That was one of
14  our developmental issues.
15          So I think I answered your question.
16      Q. You did. So, did you ever build what I'm going to
17  call the new tower?
18      A. We've built a portion of it. We have -- I'm
19  sorry. We have completed the first phase of the expansion,
20  and there is still more that we can build. The climate and
21  market is not right to build that one.
22      Q. And when did you begin construction on the
23  expansion and when did you get a CO on the first phase, as
24  best you can recall?
25      A. I would -- great question for Mark.

Page 71

1      Q. Okay.
2      A. I'm not exactly sure what day we broke ground, and
3  I hate to say it, but I don't even remember what day we
4  opened.
5      Q. You're operating this as a Westgate facility now.
6      A. Correct.
7      Q. And it still has a hotel portion?
8      A. Those first two buildings that I said, the 200 --
9  let's call it, let's say 305 less the 84, 221 units, I
10  guess, are still operated as a hotel.
11      Q. Okay. Is any portion of it -- I'm going to use a
12  sloppy term -- a condotel? Did you ever market portions of
13  this as hotel rooms that would be owned in a horizontal
14  property owner scheme?
15      A. We were going to build -- we sold whole ownership
16  condominium units in the building that we -- the first
17  phase of the expansion that we did, yes. A portion of it
18  we're selling as timeshare, and there were some units that
19  we sold as whole ownership.
20          When you say condotel, it's a legal term. I'm not
21  exactly sure how Michael -- how Greenspoon Marder created
22  it within South Carolina.
23      Q. Understood. Help me to understand numbers and how
24  you track numbers for timeshares.
25          If you sell a unit, if I start asking you

Page 72

1  questions about how many were sold, it could be Room 337
2  that you're referring to, but there's also 52 weeks that
3  you could be selling on Room 337. And I get confused when
4  I talk to people about timeshares, whether you're talking
5  about weeks or days or you refer to it by rooms. And when
6  you market them, I guess you can't market the whole year's
7  worth, because you're selling individuals blocks.
8          That's an awful question, I admit, but how do you
9  speak of the timeshare units and their sales?
10      A. Intervals.
11      Q. Okay.
12      A. Timeshare interval. And an interval could be a
13  whole week. What that means is you get -- you're deeded
14  every year, or it could be what we call a half-week or a
15  biannual week, which is you buy every even year in a unit
16  or you buy every odd year in a unit. Now, the deed -- the
17  deed to a unit is for deeding purposes, for us to be able
18  to put a mortgage on that, because we finance most of our
19  purchases through our company.
20          But as far as the use side, the units, they all
21  float within a season together. So there's a high season,
22  that if you buy a week during the high season, and I don't
23  have the float use plan in front of me, but let's just say
24  it's 12 weeks in the peak time; that you can come one week
25  within those 12 weeks for that specific unit type that you

18 (Pages 69 to 72)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

## Page 73

1  purchased. Or you can use one of the off-season weeks if
2  you chose to, but typically, people won't pay the premium
3  for the highest premium unit and want to come in January,
4  which would be the lowest, you know, the slow time in
5  Myrtle Beach.
6      Q.  Right. When you're converting hotel rooms to
7  timeshare units, is there a break point that you're trying
8  to reach on the intervals for a given space that justifies
9  moving additional properties into the timeshare regime?
10     A.  The way our business model works for timeshare --
11  I think that's what you're asking me.
12     Q.  Okay.
13     A.  Building three, what we would look at is how many
14  units, which is 28 or 56, 28 two-bedrooms or 56 keys, how
15  much I can generate in revenue against those units; revenue
16  being timeshare revenue which is, and it's really net
17  timeshare revenue.
18         I sell a week to somebody, there's two different
19  ways that someone can cancel. One is there's a rescission
20  period in which they send a letter and they want to cancel,
21  we let them cancel their contract; a cooling-off period.
22  Or sometimes we sell weeks to people where they don't put
23  -- we typically have ten percent as a minimum down payment
24  someone has to put in. If someone pays $10,000 for a week,
25  they have to put a thousand dollars down. At that point in

## Page 74

1  time, they are now a full down. It triggers the promissory
2  note, things like that.
3          If someone cannot put the ten percent down on day
4  of sale, we will allow them to put a lesser deposit down.
5  That's called a pending sale. Those sales, some of them
6  come good, which means they end up putting the ten percent
7  down, and some do not come good, which means they gave us
8  $300 and they never gave us another dime towards the $1,000
9  down payment that I gave as an example on the $10,000 sale.
10         Once we see what that net timeshare revenue is,
11  and we look at our construction cost of the building and
12  convert it in units, we look to see that the product cost,
13  which is construction cost divided by net timeshare
14  revenue, is within the model that we would go forward with.
15  Typically, in our business, that is 20 to 25 percent.
16         Additional to that, we have sales and marketing
17  costs that traditionally in our model is 45 to 50 percent.
18     Q.  Hmm.
19     A.  Now, this is traditional to the timeshare model as
20  it existed back in 2006 and all the way through June or May
21  of 2007. So I'm not talking about -- there's a new model
22  in the timeshare business that was created by the whole
23  credit crisis, so I am talking about while we had the
24  temporary license in place.
25         So I think you're asking me how do we -- the

## Page 75

1  question I heard. I'm being very vague, which I don't -- or
2  all over the place, which I try not to be in deposition,
3  but for us to decide whether we're building additional
4  timeshare units or converting timeshare units is we want to
5  make sure that my sales and marketing is going to be in the
6  45 to 50 percent, my product cost is going to be in the 20
7  to 25 percent.
8          And then before we start doing big expansion, we
9  also look at the percent of people that default on their
10  mortgage. Those would be people that actually put down at
11  least ten percent, were making payments, we deeded them
12  interest in the property. And for whatever reason, they
13  end up not fulfilling their obligations under the mortgage
14  and we foreclose on them. We see what percent that is, and
15  then we decide that we're making money and we move forward.
16         But those are the big costs associated with our
17  business.
18     Q.  Okay. That's very helpful.
19         What I wanted to do was get some basics so I can
20  understand the matrices to talk about how well this project
21  was doing at different benchmarks. You go in with a
22  business plan, everybody wants to make money --
23     A.  Correct.
24     Q.  -- and you're looking at this product.
25         So let me back really out to a very high level and

## Page 76

1  ask you, as we move into the termination period of May of
2  2007, if that's the right date, how well had this worked
3  economically for Westgate?
4      A.  On the timeshare side?
5      Q.  Yes.
6      A.  Not as well as we would have liked, only because
7  the credit worthiness of people who go vacation in Myrtle
8  Beach, and particularly where we're located in Myrtle
9  Beach, weren't as high as we would have liked. We were
10  getting -- our mortgage default was a little higher than it
11  was in other places, so we weren't making as much money as
12  we would have liked to have been make going.
13     Q.  So that default issue was occurring. That's a
14  contemporaneous thing that you're talking about. You're
15  having a default experience that's higher than normal that
16  is beginning to manifest itself somewhere between 2004 and
17  2007.
18     A.  Only manifesting itself because now I have some
19  data and some history of people I've sold, yes.
20     Q.  What I want to make sure of, to sort of back out
21  of this, I assume that everything went haywire as of
22  October of 2008 in your industry, as with other industries.
23     A.  It was a new world, and yes, haywire probably is
24  too vague. We ran into the wall in our business.
25     Q.  Okay. I just want to make clear that we're not

19 (Pages 73 to 76)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 77

1  talking about that. We're talking about you get in there
2  and you realize something that hadn't been fully
3  appreciated, I take it, at the beginning, which is the
4  credit worthiness of folks at this particular facility is a
5  little lower than with some of the other facilities.
6      A.  That is correct.
7      Q.  And it's impacting your bottom line.
8      A.  Correct.
9      Q.  And obviously, that's not something for which my
10  client has any responsibility. Correct?
11      A.  I was answering -- that has -- Holiday Inn now
12  knows something they probably don't need to know, but you
13  asked a question and I just gave --
14      Q.  You're being very, very responsive. And the
15  reason I need to know what we were talking about a moment
16  ago is because I wanted to understand how the project was
17  going, and you've told me that. And I'm going to
18  characterize it in the way that I heard it. I'm going to
19  see if I'm correct.
20      The investment in this property proved to be
21  profitable, less so than you originally hoped in large part
22  because of these credit issues we talked about.
23      A.  Right. And there was one other thing I didn't
24  interject, but I will now.
25      You brought up that we condominium-ized -- I will

Page 78

1  call it condominium-ized. I don't know, again, the legal
2  structure, but we set up the new building that we could
3  sell some whole ownership condominiums in. That's one of
4  the reasons why we expanded to the next building was
5  because we felt we could sell -- expanded when we did,
6  because there was a good market for selling whole ownership
7  condos at that time.
8      It just turned out that we made sales, but when it
9  came time to close sales, we happened to be in the middle
10  of the credit crisis.
11      So even though the credit worthiness wasn't as
12  high as I would have liked on the customers, the customers
13  we were, you know, having tour our timeshare, we were still
14  in a good market to be able to expand, build a tower, get a
15  little more timeshare inventory to sell.
16      But again, another reason we didn't make it or
17  haven't made as much money is we didn't also sell those
18  condominiums because you-know-what happened.
19      Q.  And I didn't understand. I'm sure you told me
20  this very clearly before. The new tower, the new building,
21  is all whole ownership?
22      A.  No. The new building has, I believe, 18-ish
23  stories, and we -- we have sold timeshare in about
24  70 percent of the building, and left the top units to sell
25  as whole ownership.

Page 79

1      At this point, we haven't sold all of those. So
2  if we needed any timeshare, we'll sell those as timeshare.
3  But it was a mixed-use building.
4      Q.  Did the property get its CO post-credit crisis?
5      A.  Again, I don't know the exact -- I don't remember
6  the exact date. Real close.
7      Q.  Okay.
8      A.  Real close.
9      Q.  If what I'm hearing is correct, you experienced,
10  like a lot of our clients have, this experience of having
11  presold units and people just defaulting on the closings of
12  those units.
13      A.  And walked away from the deposits. Correct.
14      Q.  Okay. The financing arm of Westgate, is that a
15  separate entity?
16      A.  Well, when I say, I'm just talking about me, the
17  company, we -- we sell the timeshare, you know, market,
18  sell it, have entered into a contract for purchase and
19  sale, and then a mortgage.
20      And then when we get ten percent down, we have
21  credit facilities with third-party banks that we pledge
22  those mortgages -- we hypothecate the mortgages to, so we
23  still have them. We just get an advance against it.
24      So is it a different company? I'm not even sure
25  how we structure our financing as far as under what

Page 80

1  umbrella.
2      Q.  But to your knowledge, you don't have -- a lot of,
3  no matter what you're selling, a lot of people who sell
4  inventory have captive financial institutions, but you
5  don't. You hypothecate to a third party.
6      A.  Correct.
7      Q.  Look at tab 35 under Exhibit 2.
8      A.  Okay.
9      Q.  And I'd like your help in interpreting what these
10  documents are. I believe they're your documents. Is
11  WG09500 your document?
12      A.  Yes.
13      Q.  Tell me what it is and how to interpret it.
14      A.  This was a profit and loss statement for our hotel
15  operation at the Myrtle Beach property for 2004, 2005,
16  2006, 2007. And it shows -- this is just the hotel. This
17  is all hotel revenue, hotel expenses, and then the net
18  income or loss.
19      Q.  So you had a loss in each year?
20      A.  We had a loss in each year.
21      Q.  And do you have documents that reflect the net
22  profit or loss inclusive of the timeshare and condo for the
23  whole project?
24      A.  No, we do not.
25      Q.  Look at the next document which is 9501.

20 (Pages 77 to 80)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 81

1    A.  Okay.
2    Q.  And tell me what this is.
3    A.  This is the occupancy percentage for the property,
4  and it's broken down by the hotel portion, the HOA portion,
5  and then the consolidated portion, which would be the
6  combination of hotel and HOA for the years '04, '05, '06,
7  '07, and it looks like it's through December of '07.
8    Q.  When you carry percentages for the hotel occupancy
9  percentage, would that be inclusive of reduced rate rooms
10  being used to market the timeshare?
11    A.  Yes.
12      I'm sorry.  That would include any room that we
13  had occupied in the hotel rooms.  So that would include
14  wholesale.  It would include transient groups and our --
15  what we call internal marketing programs, telemarketing.
16    Q.  Okay.  Do you know -- I'm looking at Page 9500.
17    A.  Yes.
18    MR. FARRIER:  We've asked for -- initially we
19  thought we're not that interested in 2008 and 2009.
20  We've asked to add on 2008 and 2009, and have you
21  responded yet, Amanda?
22    MS. CHAPMAN:  No.  I spoke with him about it,
23  though.
24    MR. FARRIER:  I don't know whether you're going to
25  raise an objection to that or not, but do you know?

Page 82

1  I'll ask you the question.
2      Do you know whether 2008 -- I'm sorry, 2008,
3  through October of 2008, how that was trending?
4    MS. CHAPMAN:  I'll object to form, but you can
5  answer, if you know.
6    THE WITNESS:  I don't know off the top of my head.
7  BY MR. FARRIER:
8    Q.  Okay.  What I'm curious about is whether or not
9  the experience pre-credit crises and post termination,
10  after you pulled down the Holiday Inn flag, whether the
11  economic experience was better or worse than it was when
12  you were flying the Holiday Inn flag.
13    A.  I don't know off the top of my head.
14    Q.  Look at 9502, and see if you can tell me what that
15  document is.
16    A.  This is our developer net contribution.  What that
17  means is the units that are within the HOA, there are
18  unsold units that the developer has to pay the maintenance
19  fees on.  And when we do that, we rent those units out to
20  try to recoup the maintenance fees we pay on the unsold
21  units.
22      This exhibit here, this financial here shows how
23  much I paid in development assessment, how much rental I
24  got back, and whether we made money or lost money on the --
25  on the developer owned units.

Page 83

1    Q.  You put them back in the hotel operation,
2  basically?
3    A.  I would rent them out as hotel rooms, yes.
4    Q.  Okay.  In one of the areas in which I believe you
5  are designated for, which is number nine, the amount of
6  revenue and profit realized by Westgate related to the
7  property during the period in which it operated --
8    A.  Yes.
9    Q.  -- what I would really like to understand is
10  whether or not you were making money on this property if
11  you put it all together.  If you put the timeshare
12  business, the hotel business, and we don't know when the
13  condo business comes in, so I'm just saying whatever is
14  there from 2004 through 2007, can you tell me whether you
15  were making money at this property?
16    A.  I was not making money at this property.
17    Q.  Were you losing money?
18    A.  I was losing money at this property.
19    Q.  And did that cause any alarm?
20    A.  No.  The only reason it didn't cause alarm is when
21  you sell timeshare, because you've asked about it all, when
22  you sell -- I shouldn't say that.
23      Yes, it always causes me alarm when I'm losing
24  money.  I don't want to lose money any time.
25    Q.  Right.

Page 84

1    A.  But there are some costs in a timeshare that you
2  start to sell units, and when you start to build what's
3  called an in-house program, meaning you have owners, and
4  when they come back you can sell them an additional week,
5  it has very low sales and marketing cost.  So we were
6  hopeful that we could turn it around sooner rather than
7  later and start to generate a profit.
8      And we were also hopeful that we could sell off
9  units as whole ownership.
10      To this date, I still have not turned a profit at
11  that property.  Now I'm concerned.
12    Q.  Is there -- is there a trend in your experience
13  with similar timeshare developments by which you begin to
14  return profit?
15      In other words, is this a business where you're
16  looking for a five to seven-year period of investment that
17  begins to return profit on the back end of that cycle, or
18  is it a fairly steady graph?
19    A.  Depends.  It has to be a more specific question,
20  because it really depends on how much you've paid for the
21  property, how many units you've built, how much -- you
22  know, what's your up front cost and what's your sales pace
23  to be able to generate, to get to a profit.
24      So there are some instances that you could
25  generate a profit relatively quick if you spent very little

21 (Pages 81 to 84)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

## Page 85

1  on the property and you had a big in-house program and a
2  lot of marketing. And then there are other instances where
3  you have a very high up front cost and very little
4  marketing ability that will take five to seven years to
5  turn a profit; not really a deal that Westgate would like
6  to do.
7      Q. Understood. If you had it to do over again, you
8  probably wouldn't have done this deal.
9      MS. CHAPMAN: Object to form.
10     THE WITNESS: What deal are you asking?
11 BY MR. FARRIER:
12     Q. You would not have invested in this property,
13 entered into the 9/24/2004 agreement to purchase.
14     MS. CHAPMAN: Objection to form.
15     THE WITNESS: If the question is do I wish we
16 didn't own this property today, and if I could turn
17 back the clock, would I, and not purchase it? Yes.
18 BY MR. FARRIER:
19     Q. That was my question.
20     A. Okay.
21     Q. You mentioned a new model that had come into the
22 industry. Can you tell me when that occurred, and as
23 briefly as you can, what the new model is.
24     A. September of 2008 is when the new model was
25 created.

## Page 86

1      Q. I'm fine. Just in terms -- it's interesting, but
2  it doesn't really relate to the case, I don't think.
3      A. It was when Lehman Brothers went down.
4          And how has the business model changed? That was
5  the second part of your --
6      Q. Yes.
7      MS. CHAPMAN: Objection, to the extent you're
8  asking him how it changed.
9      MR. FARRIER: You know what, let's skip beyond
10 this, because it really doesn't impact. I'm interested
11 just because I'm interested, but it doesn't impact the
12 case.
13     THE WITNESS: We can do that after.
14 BY MR. FARRIER:
15     Q. How many properties, approximately, does Westgate
16 have? And I don't mean units. I mean, how many places
17 like Myrtle Beach are in the Westgate empire?
18     A. 28.
19     Q. And you're the second largest in the world?
20     A. We're the largest privately owned in the world.
21     Q. Is there any -- is there any personal
22 responsibility that you or -- and this is a question for
23 David Crabtree -- you or the other folks within Westgate
24 have for a particular project? Are you judged, bonused,
25 paid on the profitability of the projects that you initiate

## Page 87

1  and manage?
2      A. I make a flat salary and I don't -- I don't have
3  any bonus structure, nor do any of my peers related to
4  specific projects.
5      Q. Okay. Are you tagged with specific projects? To
6  the extent, and I want to speak very much in the
7  vernacular. To the extent some property becomes a dog, is
8  it Dave's dog or is it more of a team approach to projects
9  like this?
10     A. At the executive level, it's a team dog. There's
11 individuals who work at specific properties that they would
12 be the ones that we are leading and managing.
13     Q. Right.
14     A. But there are no projects -- when I'm talking
15 about my level, which be include Mark Waltrip, we
16 don't have specific that's yours, this is mine. They're
17 ours.
18     Q. Okay. Good. And just so I understand the
19 culture. The culture is, in a situation like this where
20 you've got a less profitable investment, there is generally
21 support within the organization at the executive level,
22 say, to the extent that this is a property that you're
23 managing, a sense of, well, Dave's got his hands full with
24 the Myrtle Beach market because it's really a different
25 kind of market than we originally thought it was, that sort

## Page 88

1  of mind set.
2      A. It would more of the mind set that if the person
3  wasn't performing who was there, I would get a new leader
4  and put them in there to perform.
5      Q. Okay.
6      A. With that said, I run the marketing for all of the
7  properties. If they're all dogs, then it's Dave's dog.
8      Q. Don't let this frighten you, but turn back to the
9  first tab in the document.
10     A. We're going backwards. Tab one.
11     Q. Just turn back there, because I want to make sure
12 that I've covered what I need to with you on these
13 documents.
14     A. Okay.
15     Q. Let me break out of this and ask you some
16 Mr. Crabtree questions. So, just some bio. You are how
17 old?
18     A. I'm 43 years old.
19     Q. And your date of birth is what?
20     A. 8/5 of 1966.
21     Q. And one of the things that we will do is run
22 background checks on people, and so I ask you this, these
23 questions, for these reasons. They also have to do with
24 the qualification of witness in South Carolina.
25         What is your social security number?

22 (Pages 85 to 88)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

David Crabtree  May 17, 2010

Page 89

1      MS. CHAPMAN:  Off the record, please.
2      MR. FARRIER:  That's fine.  This can be off the
3  record.
4      (Discussion off the record.)
5      MR. FARRIER:  Back on the record.
6  BY MR. FARRIER:
7      Q.  Your address?
8      A.  9006 Southern Breeze Drive, Orlando, Florida,
9  32836.
10     Q.  Any relatives in South Carolina?
11     A.  Not that I know of, and I don't mean that cute.
12     Q.  We've all had our youth.
13         Have you ever had your rights taken away and not
14  permanently restored?
15     A.  No.
16     Q.  Never been involuntarily committed to either a
17  psychiatric or a drug or alcohol facility?
18     A.  No.
19     Q.  And never been convicted of a crime with a
20  sentence greater than one year?
21     A.  No.
22     Q.  What is your educational background?
23     A.  I have an undergraduate degree in hotel/restaurant
24  management from the University of Wisconsin-Stout, and I
25  have an MBA from UNLV.

Page 90

1      Q.  Where have you worked prior to working with
2  Westgate?
3      A.  Right out of college, I was a manager of a Ruby
4  Tuesday's restaurant.  Then I moved to a hotel management
5  company called AmeriHost Properties.  I was a property
6  controller.
7         Then I went and worked for the actress Debbie
8  Reynolds in Las Vegas, Nevada.  We had one property; ended
9  up taking the company public.  I helped run the public
10  company with her.  She was the largest shareholder, but her
11  son and myself.
12        And then I met David Siegel and started working
13  for him in October of 1998.
14     Q.  Do you have any degrees or do you hold any titles
15  other than what you just mentioned?
16     A.  No.
17        By the way, UNLV is University of Nevada, Las
18  Vegas.
19     Q.  The Lobos.
20     A.  No, the Runnin' Rebels.  That's New Mexico.
21     THE WITNESS:  Can we go off the record one second?
22  I can't let this one go.
23     (Discussion off the record.)
24  BY MR. FARRIER:
25     Q.  Look at Exhibit No. 3, please.

Page 91

1      A.  Yes.
2      Q.  Tab 3 in Exhibit No. 2.  Thank you.
3         This is a letter that you drafted and sent to
4  Kathy Pitchford on October 27, 2004.
5      A.  Okay.
6      Q.  Is that correct?
7      A.  Yes.
8      Q.  And as of this date, you were proposing to license
9  all the rooms there to Holiday Inn initially, and then
10  remove rooms as needed for timeshares on a floor by floor
11  basis.  Correct?
12     A.  That's the way it reads.
13     Q.  And in fact, that was the plan that Westgate had
14  in mind at the time.  Correct?
15     A.  Very similar to the deal I did with Ramada Inn.
16     Q.  Okay.  And if you look at subparagraph eight, the
17  idea was within the ten years of the license agreement, all
18  of the hotel rooms would be taken out of the Holidex system
19  and be timeshares.  Correct?
20     A.  That was the original thought, yes.
21     Q.  And if you look at sub 11, the idea was that the
22  Holiday Inn franchise was not going to be used as part of
23  the timeshare sales process.  Correct?
24     A.  Correct.
25     Q.  Now, when you actually began to market the

Page 92

1  timeshares, you began to use the Holiday Inn franchise as
2  part of the sales process, did you not?
3      A.  We did not.
4      Q.  You never marketed to the hotel customers?
5      A.  Not through the reservation system.
6      Q.  How about when they were on-site?
7      A.  Once someone is on-site, that's completely
8  different in my opinion.
9      Q.  They're fair game.
10     A.  Then I'm marketing to them, but definitely not
11  through the use of Holiday Inn's name or the reservation
12  system.
13     Q.  Okay.  And I didn't understand that distinction,
14  so help me out with that a bit.
15        Once they are on-site, you feel like they're fair
16  game for the marketing of the timeshares.  Correct?
17     A.  Correct.  I have a booth right in the middle of
18  the lobby that I sell -- I said this earlier, but I'll sell
19  attraction tickets, discounted restaurant vouchers, and
20  other things.  And when an individual comes over to the
21  booth, I'll offer them those attraction tickets or
22  restaurant vouchers or whatever else may be there for sale
23  or for free if they want to take a 90-minute tour.
24        So I don't -- I don't perceive that as being
25  through the franchise system, just as if I have 50 hotels

23 (Pages 89 to 92)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Westgate v. Holiday Hospitality

David Crabtree  May 17, 2010

## Page 93

1  that I have booths in in this town, and say all of them or
2  most of them have a franchise, a flag on the property, when
3  the people -- I don't have franchise agreements with
4  whoever the flag is on that hotel.
5      Q.  Okay. Look at tab four, if you will.
6      A.  Okay.
7      Q.  This is a letter that you drafted and sent to
8  Kathy Pitchford on November 24, 2004. Correct?
9      A.  Yes.
10      Q.  And I don't understand what conversation may have
11  taken place in the interim, because it looks to me like
12  you're trying to clarify things in this letter to Cathy.
13      If you can, tell me what her reaction was to your
14  tab three letter and what you were trying to clear up in
15  tab four.
16      A.  I don't specifically remember exactly what her --
17  what our conversation was. I mean, I could read this and,
18  you know, give an educated guess on what it was.
19      Q.  Really, I'm asking anything you recall. Anybody
20  could draw inferences from a letter.
21      A.  Correct.
22      Q.  But do you recall what she may have been concerned
23  with?
24      A.  I don't remember.
25      Q.  You knew at the time of November 24th that the

## Page 94

1  application was contingent -- the application for license
2  agreement was contingent upon approval. Correct?
3      A.  Correct.
4      Q.  Look at tab number six.
5      A.  Okay.
6      Q.  And specifically Page 1290, looking at the Bates
7  stamp.
8      A.  Okay.
9      Q.  And I just wanted to show you this as an example.
10  This is the first interim temporary license. Correct?
11      A.  Okay. Correct.
12      Q.  I will say it's an early one. I don't actually
13  know if there might have been one for November, but I
14  believe this was the first one.
15      But this is what the licenses -- the temporary
16  licenses that were executed by you looked like. Correct?
17      A.  I believe we signed one temporary license, and
18  then we just kept signing extension addenda.
19      Q.  And as you signed these documents, I asked you
20  about some of the terms, and we confirmed that both parties
21  abided by the terms of the temporary licenses. Correct?
22      A.  Correct.
23      Q.  And if you look at the page I'm showing you, I
24  just wanted to confirm this part of this agreement: This
25  License will expire without notice on six months. This

## Page 95

1  License is not renewable. The License confers no rights of
2  license renew following the expiration of the License Term.
3      All of the renewals were bound by similar terms,
4  although the time frames varied. Correct?
5      A.  Correct.
6      Q.  If you'd look at tab seven --
7      A.  Okay.
8      Q.  Have you ever seen this document before?
9      A.  I don't remember seeing this document, per se.
10      Q.  Okay. This is a document, I will assert, which is
11  the triggering and sort of the call of the liquidated
12  damages that actually was anticipated in the 9/24/2004
13  letter. I'm asserting that to you.
14      The fact that this was occurring was not a
15  surprise to you, was it?
16      A.  No.
17      Q.  In fact, it was anticipated by you that there
18  would be liquidated damages that was asserted against MBII.
19      A.  Yes.
20      Q.  And if we look at the next document, document
21  number eight, as of January 6th of 2005, there is still no
22  long-term franchise agreement in place. Correct?
23      A.  Correct.
24      Q.  As of January 6, 2005, Westgate had paid this
25  $1.264 million into escrow. Correct?

## Page 96

1      A.  There was money put in escrow. I don't think it
2  was on that date, but there was money put into escrow about
3  that time, yes.
4      Q.  I'm saying that as of that date, they had paid
5  that into escrow. Correct?
6      A.  Correct.
7      Q.  And this is evidence of that escrow being drawn
8  upon. Correct?
9      A.  Correct.
10      Q.  If you look at tab number nine --
11      A.  Yes.
12      Q.  I wanted to ask you about a genre of potential
13  claims in a lawsuit like this. In this document, there is
14  a statement we signed a contract for the installation of a
15  lazy river pool. During this time period, it is, I think,
16  an agreed fact that Westgate spent money on this property
17  in various ways. Correct?
18      A.  Yes.
19      Q.  They built this 18 story tower. They did things
20  like put in a lazy river pool. They refurbished the hotel
21  facilities or Holiday Inn refurbished them and you were
22  required to pay for them, things like that. Correct?
23      A.  Correct.
24      Q.  None of those things forms the basis of a claim
25  for misrepresentation in this case, do they?

24 (Pages 93 to 96)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 97

1    MS. CHAPMAN: Object to form.
2    THE WITNESS: I don't know the legal requirements.
3    I don't know. I don't think I can answer that.
4    BY MR. FARRIER:
5    Q. Let me ask it in a very simple way. You were
6    doing these things as an investment on the property,
7    ultimately for the gain of Westgate. Correct?
8    A. For the gain of us and, hopefully, full well
9    knowing that if we were going to enter into a long-term
10   agreement with Holiday Inn or another flag, these were
11   things that needed to be done.
12   Q. What I'm trying to get to is, you weren't misled
13   by any statements from anybody associated with my client
14   into doing any of these things, were you?
15   MS. CHAPMAN: Object to the form.
16   MR. FARRIER: Go ahead.
17   THE WITNESS: Not that I am aware of.
18   BY MR. FARRIER:
19   Q. Look at tab 13, if you will. Do you recall being
20   at a meeting -- I'm sorry. Have you had a chance to look
21   at the letter?
22   A. I'm sorry. I'm looking at it right now.
23   Q. Sure. Do you recall being at a meeting with John
24   Merkin, Julie Baldwin, and these folks, on or about this
25   point this time?

Page 98

1    A. I remember being in two different meetings, and I
2    can't remember the specific date, but it would be
3    reasonable to be, at this point in time, at one of the
4    meetings. So yes, I do remember meeting twice with Holiday
5    Inn.
6    Q. What was discussed in those meetings?
7    A. Well, there were two different meetings. One, the
8    first one, was us talking about our vision of the property,
9    what we were planning to do with the property, and even
10   brought -- Waltrip, the first meeting, Waltrip was at also,
11   and he brought a swatch board, a swatch board meaning with
12   some conceptual design elements of what we were going to do
13   with the upgrading of the facility.
14   So the first one was kind of meet and greet, break
15   bread, show them what we're trying to do, hopefully get
16   them to understand and like what we're going to be doing so
17   we could get to finalizing the ultimate goal which was the
18   ten-year agreement.
19   The second meeting, which again I don't know which
20   meeting was which, was only attended by Richard Moore, Rob
21   Jackson, and myself, and that was talking more about the
22   specifics of how we were developing the timeshare plan and
23   any expansion that we're doing and things like that.
24   Q. Okay.
25   A. So that was more for the negotiation of getting

Page 99

1    the deal done.
2    Q. And can you place either of those meetings in
3    time?
4    A. I wish I could, but that one I'm completely
5    drawing a blank on.
6    Q. Let me ask you a couple of questions that go back
7    earlier in the day, and I'm not trying to repeat things,
8    but you mentioned earlier that everything that came into
9    Richard Moore, he would share with you.
10   A. When I say that, I'm not talking about a hundred
11   percent of everything he receives. I'm talking about
12   everything that Richard Moore gets in related to franchise
13   issues, comments, negotiation that he knows that I'm a part
14   of, he always sends it on to me because we have a very good
15   relationship, and he knows I would want it and he respects
16   me and I respect him.
17   Q. And by what medium does he send it on to you?
18   A. Typically, depending on how it is back then, it
19   would probably be fax. Now, if it was today, it would
20   probably be scanned and e-mailed.
21   Q. Are your offices close to each other?
22   A. No. We're across town.
23   Q. In the last paragraph, the last two paragraphs,
24   there's a discussion in here. Have you ever seen this
25   letter before?

Page 100

1    A. I don't remember seeing it.
2    Q. Contemporaneous to this letter, and I mean that
3    not specific to September 28th of 2005, but in this 2005
4    negotiation time frame, were you aware of the process
5    internal to my client for approval of a franchise agreement
6    as outlined in these two paragraphs?
7    A. I was aware of how, on a very broad basis, of how
8    it worked. It would be the franchise salesperson, their
9    boss would figure out if there was a property that they
10   wanted to license. They would go through their process to
11   make sure there was no restrictions or reason they
12   couldn't, maybe even through legal, and then they would
13   present it to a committee who would hopefully approve or
14   deny.
15   Q. Okay. And let me just ask you if you understood,
16   at this point this time, these basic tenets of the process.
17   First of all, that there was a franchise approval committee
18   that made the final decision.
19   A. Yes.
20   Q. And that there were people that you interfaced
21   with, but ultimately that would have to be presented to
22   that committee for the approval.
23   A. Correct.
24   Q. And that until the approval or disapproval, I
25   should say -- start over.

25 (Pages 97 to 100)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 101

1  Until the approval was granted, that it was always
2  contingent that it was not approved.
3      MS. CHAPMAN:  Object to form.
4      MR. FARRIER:  That was an awful question.
5      MS. CHAPMAN:  I'm trying to decipher that.
6  BY MR. FARRIER:
7      Q.  Well, there's a statement in here that the
8  acceptance and processing of an application should not be
9  considered as an indication that the application will be
10  approved.  Do you see that statement?
11     A.  Yes.
12     Q.  And you understand that to be the status of the
13  process of the committee.  Correct?
14     A.  Correct.
15     Q.  And you understood it at the time.
16     A.  Correct.  I also understand that they're not going
17  to present it to the committee unless they believe it is
18  going to be passed, because no one wants to be denied even
19  if they're not the owner of the property.  Internal to
20  Holiday Inn, they are the owner of the property.
21     Q.  I know that you're not the quality -- the quality
22  spokesperson for this property, but were you aware that
23  there were quality concerns being expressed by my client
24  that needed to be addressed in their mind prior to moving
25  forward with a long-term franchise agreement?

Page 102

1      A.  I really never focussed on it.
2      MS. CHAPMAN:  Richard, would you mind if we take a
3  -- well, finish your answer, please.
4      THE WITNESS:  But a PIP is not uncommon for
5  anybody entering into any franchise agreement.
6      MR. FARRIER:  Let's take a break.
7      MS. CHAPMAN:  Thank you.
8      (Brief recess.)
9  BY MR. FARRIER:
10     Q.  Look at tab 15, if you will.  I just need you to
11  confirm that this is an e-mail that you received on
12  January 4, 2006.
13     A.  I don't recall specifically, but it shows that I
14  received it, so.
15     Q.  And it appears to attach the items which could be
16  considered deal breakers.
17     A.  Correct.
18     Q.  Do you recall those being deal breakers at the
19  time?
20     A.  I have to turn -- I haven't looked at the second
21  page yet.  Is that the next page?
22     Q.  I believe it to be, but that's ultimately a
23  question for you.
24     A.  I don't remember specifically this going on, but
25  it doesn't seem unreasonable if this is what was attached.

Page 103

1      Q.  Look under tab 17, and it is an e-mail from
2  Richard Moore to Elisa Adams.  First of all, have you seen
3  this document prior to today, to your knowledge?
4      A.  Not that I remember.
5      Q.  It attaches a business plan for the Holiday Inn
6  Myrtle Beach oceanfront, a three page document bearing
7  Bates labels HHF200465934 --
8      A.  Yes.
9      Q.  -- through 936.
10     A.  Okay.
11     Q.  Can you identify this business plan for me?
12     A.  I believe, I do remember seeing this.
13     Q.  What is it?  Is it a document prepared by
14  Westgate?
15     A.  It was a document that, via a phone conversation,
16  I believe -- I think I'm remembering this -- where we
17  discussed over the phone that Holiday Inn was requesting
18  kind of an outline of what we were planning to do with the
19  property.  Richard Moore was discussing this with me, but
20  he was letting me in on a conversation he was having.
21     And then we put together, as succinctly as we
22  could, what we were looking to do on the property.
23     Q.  Okay.  Look at tab 20, please.
24     A.  Okay.
25     Q.  And this does not have a signature on it, so if

Page 104

1  you would look through it, I am curious to know who drafted
2  this letter, if you can tell.
3      A.  This reads as if I wrote it, so I believe this is
4  a letter from me.
5      Q.  Okay.
6      A.  I'm surprised there's no signature on it, though,
7  but I believe this letter is from me.
8      I am the only one in the organization that would
9  write a letter like this to Holiday Inn, unless it came
10  from Siegel directly, but I know that did not happen.
11     Q.  Okay.  In this letter, it clearly reads as though
12  the author of this letter was unaware of any approval that
13  had been extended as of this date.
14     A.  Correct.  That broke up.  I said "correct."
15     Q.  One of the things I didn't complete before that I
16  think we can cover pretty quickly is I asked you what my
17  client had done improperly, untowardly, unfairly to
18  Westgate under your factual scenario, and I told you I was
19  going to ask it both ways.
20     If, in fact, our factual scenario is correct, and
21  that is that an approval was communicated sometime in 2006
22  of a long-term kind of license, would you agree with me
23  that my client had done everything that it should have with
24  regard to the negotiations with Westgate?
25     MS. CHAPMAN:  Object to form.

26 (Pages 101 to 104)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 105

1    THE WITNESS:  The only reason I can't say yes or
2   correct on that, on your question, is because if it was
3   everything, I think we would have entered into an
4   agreement.
5   BY MR. FARRIER:
6    Q.  You would agree with me that under our factual
7   scenario as presented, there was no act or omission to have
8   caused harm to Westgate.  Correct?
9    MS. CHAPMAN:  Object to form.
10    THE WITNESS:  I don't -- you have not shown me
11   anything where there was any malicious intent that I am
12   aware of.
13   BY MR. FARRIER:
14    Q.  And you're not aware of any such -- malicious
15   intent, actually, as we lawyers speak, is a fairly elevated
16   level of bad things.  So I'm going to ask you -- I'm going
17   to recharacterize your words.
18    You're not aware of anything that my client did to
19   cause harm to you, are you?
20    MS. CHAPMAN:  Object to form.
21    THE WITNESS:  The only thing, again, and I said it
22   earlier, too.  I know it's been awhile, but I always
23   try to stay consistent on everything I do.  I don't
24   know exactly what was happening within the confines of
25   the walls at Holiday Inn.  I don't know if the intent

Page 106

1   of Holiday Inn was to just continue to take franchise
2   fees from me without ever planning to enter into an
3   agreement with me.  If they did that, I think there is
4   some harm.
5    You have not shown me anything that has shown me
6   that they have done that.
7    Q.  Okay.  And conversely, if the true facts are that
8   they were negotiating with the intent of entering into the
9   ten-year deal with you, you would agree that they have not
10   done anything to cause you harm.
11    MS. CHAPMAN:  Object to form.
12    THE WITNESS:  If their intent was to enter into a
13   ten-year deal with me, once I entered into a ten-year
14   deal, my plan was to get my liquidated damage back, or
15   to reduce, more particularly, reduce the franchise fees
16   to get it back, I would not have been caused any harm.
17   BY MR. FARRIER:
18    Q.  Okay.  Do you recall any demand you made to either
19   Merkin or Adams, in this June time frame, saying that my
20   client had a week to show progress on the application or
21   the relationship would be terminated?
22    A.  Typically, when I get to a point where I feel like
23   we're not getting anywhere and I start to get frustrated, I
24   usually give a short period of time to show good faith.  So
25   that wouldn't surprise me if I had that conversation or

Page 107

1   sent a letter to them.
2    Q.  But you don't have any active recollection of
3   that?
4    A.  I can't -- I can't remember anything specific
5   right now.
6    Q.  Look at tab 30 in Exhibit 2.
7    A.  Okay.
8    Q.  I would just like you to confirm that you received
9   this letter on or about December 6, 2004.
10    A.  I believe so.
11    Q.  You were aware, prior to executing the temporary
12   license, that the property was receiving failing QFI
13   scores?
14    A.  I was.
15    Q.  And the real quality discussions or negotiations
16   would have taken place between Mr. Moore and Holiday?
17    A.  On an operational level, yes.  When I say
18   operation, I mean getting the stuff done that needed -- the
19   requirements to get done, yes.
20    Q.  If you will look at Exhibit No. 31, first confirm
21   that this is a letter you received on or about July 12th or
22   13th, 2005.
23    A.  Yes.
24    Q.  One of the things that you suggested as plausible
25   that would be a bad thing for my client to do would be to

Page 108

1   milk you for fees while just stretching out the
2   negotiations.
3    You've asserted that you don't have any evidence
4   that that's a possibility of a bad thing that my client
5   might have done.  Correct?
6    A.  Correct.
7    Q.  In fact, in this letter, my client is actually
8   seeking to default you as early as July of 2005.  Correct?
9    A.  Correct.
10    Q.  And that would run counter to the idea of someone
11   milking you for fees.  Correct?
12    MS. CHAPMAN:  Object to form.
13    THE WITNESS:  I believe they still wanted me to
14   get up to standard, and they probably used this as
15   leverage to push us to make sure that we complied to
16   get up to the quality standard.  Even milking me or
17   milking me for fees, they still don't want to do
18   anything to tarnish their brand.  The brand would still
19   come over the fees that we would be paying in a value
20   proposition.
21   BY MR. FARRIER:
22    Q.  And that's just good business on their part to try
23   to maintain the brand.  Correct?
24    A.  Yeah.  I would never dispute that, correct.
25    Q.  Look at tab 32 and confirm that this is a letter

27 (Pages 105 to 108)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

## Page 109

1  that you received on or about October 21, 2005.
2      A. Yes.
3      Q. And similar to the previous letters, this is a
4  90-day notice of default and termination.
5      A. Yes.
6      Q. Unless the OSI scores come up. Correct?
7      A. Correct.
8      Q. And this is just consistent with my client trying
9  to maintain the quality of its brand. Correct?
10      A. Correct, which I would never say anything bad
11  about your client or the quality of their brand. I think
12  they are very consistent and they do a good job.
13      MR. FARRIER: Would you allow us to meet for a
14  moment?
15      THE WITNESS: Sure.
16      (Brief recess.)
17  BY MR. FARRIER:
18      Q. All right. Let's start with tab 13 of Exhibit
19  No. 2, and what I want to do is orient ourselves to where
20  we are in September of 2005.
21      As of September, 2005, the application for the
22  long-term franchise agreement had not yet been submitted to
23  or reviewed by the FAC, the franchise approval committee.
24  Correct?
25      A. That's what appears here, yes.

## Page 110

1      Q. And you knew that that was necessary to actually
2  put that agreement into place. Correct?
3      A. Correct.
4      Q. And we flip forward to tab 14, and we see a
5  discussion between Richard Moore and Julie Baldwin about
6  what we need to go before the franchise action committee.
7  And you'll see at the bottom, "Please help me by providing
8  me what you would like to see in there." This is from
9  Richard to Julie.
10      A. Yes.
11      Q. And Julie -- and I'm adding this overlay, in what
12  might be a little bit of frustration, second paragraph, is
13  saying, and I'm not quoting, it says I've already told you
14  that. She says "Richard during our meeting in October, I
15  explained to you that we needed all these questions
16  answered so we could proceed in January providing the GSTS
17  scores were improving. I told you that IHG wanted this to
18  work out and we were willing to negotiate this in every way
19  possible."
20      So, a couple of questions about this.
21      Were you at this meeting when what was needed was
22  outlined back in October?
23      A. As I said earlier, I was in two meetings there. I
24  can't remember who exactly was there from Holiday Inn
25  specific. There was a prior correspondence that had some

## Page 111

1  names listed that I said it seemed reasonable.
2      I don't believe Richard had any meeting face to
3  face with Holiday Inn without me, so I could have been.
4      Q. Okay. But the point here is in December of 2005,
5  the status is that my client needed what is going to be set
6  out in a business plan in order to go forward with the FAC
7  approval process. Correct?
8      A. That's the way this reads, yes.
9      Q. So we flip forward to January 25th of 2006.
10      A. What tab?
11      Q. 17. Thank you.
12      A. Okay.
13      Q. And as of January 25th, would you agree with me
14  that this proposal is about to go before the FAC for the
15  first time, because we now have the business plan in place.
16      A. That's the way this reads, yes.
17      Q. If you'll turn to tab 18.
18      A. Okay.
19      Q. We know from the previous documents that we looked
20  at, the default documents on the quality issues, that as of
21  January 31, 2006, there were quality issues -- I'm sorry.
22  Strike that.
23      The short-term extension has expired as of this
24  date, and my client is extending it to allow the FAC
25  process to occur. Correct?

## Page 112

1      A. That's the way this reads, yes.
2      Q. And you don't have any evidence to suggest
3  otherwise, do you?
4      A. No, I do not.
5      Q. And so we're extending the temporary license for
6  another 30 days. Correct?
7      A. Correct.
8      Q. Okay. And then we move forward to the June time
9  frame, which is 20 and 21.
10      A. Okay.
11      Q. Do you know anything that's going -- this is not
12  an intentionally created blank period that we've made from
13  the documents. I just can't tell anything that's going on
14  in here, in this time period. Do you know?
15      Can you help us with anything that you recall that
16  might have been going on in this time frame?
17      A. I can't remember exactly what went on because -- I
18  mean, you're talking about from January 31st to
19  February 2nd?
20      Q. Right. No, no, no. From -- here.
21      The time frame is, in September -- September,
22  October, there's a meeting that occurs purportedly.
23      A. Correct.
24      Q. You may have been there. And we say, look, we've
25  got to have these things to go before the FAC?

28 (Pages 109 to 112)

Zacco & Associates Reporting Services
407-425-6789

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Westgate v. Holiday Hospitality

David Crabtree  May 17, 2010

---

**Page 113**

1    A. Correct.
2    Q. And we follow up with that in December.
3    A. Correct.
4    Q. That material isn't provided to us until January.
5    A. Okay.
6    Q. So that the first time the FAC is actually able to
7    evaluate the proposal is going to be in February of 2006.
8    A. Okay.
9    Q. Do you know what happens between that time frame
10   and the time on June 7th when you write your letter saying
11   something's got to happen here?
12   A. I'm not exactly sure what happened between then
13   and after reading my letter. I could pretty much tell you
14   at that time I probably didn't know what was going on
15   between those two dates.
16   Q. Right. And almost immediately thereafter, there
17   is an addendum proposed by my client to you for use in a
18   long-term licensing agreement. Correct?
19   A. Yeah. The exact date, I don't remember what the
20   date was when that came over, but yes, I saw an addendum.
21   Q. It's in the next tab, under tab 21.
22   A. So, like I said, five months later.
23   Q. Right.
24   A. Correct.
25   Q. So, I mean, what's -- as I look at this time

**Page 114**

1    frame, the first time the materials are pulled together for
2    the FAC to actually act on the proposal, the first time
3    they're submitted to us in complete form is in January and
4    the FAC reviews it in February according to these
5    documents. Right?
6    A. That's the way the documents read. There were
7    additional things, I believe, that were also -- I don't
8    think the business plan was the only thing that was needed
9    to take it to the FAC, so there must have been other items
10   that were delivered, you know, along the way. That
11   appears, by these, to be the last thing that was needed.
12   Q. Okay. And then if we shift forward to tab 23 --
13   A. Yes.
14   Q. -- there is a response from you to Elisa's
15   question about where are we on the timeshare addendum. Do
16   you see that?
17   A. Yes.
18   Q. And you agree that that discussion was had at this
19   time. Correct?
20   A. Yes.
21   Q. And your response is, well, I've got to get back
22   to you. I've been out of the office. Correct?
23   A. Correct.
24   (Ms. Chapman exits the deposition room.)
25   BY MR. FARRIER:

**Page 115**

1    Q. And finally, there is what I would, under tab 26,
2    on November 26th, I would characterize this as an apology
3    by Mr. Jackson for a delay in responding in the
4    negotiations. Is that a fair inference?
5    MR. LENOX: If it is, it's the first one I ever
6    heard of.
7    THE WITNESS: Yeah, there were, because of the
8    development issues, there was some slow time on our
9    part. But at the same time, I mean, we delivered in
10   February, got it in July. So if you go five months
11   form July, all of a sudden you're in December, January.
12   So I don't think it's fair to say that one side was
13   doing everything immediately and one side was waiting
14   five months. It seems like it was both ways.
15   I'm going to say now on the last question you had,
16   just because I think it's pertinent, August of 2006,
17   which is where I was definitely out of the office those
18   two weeks, the case that we had for securities actually
19   occurred that second week of August. So from my
20   perspective, it was a very large case, and I was
21   right -- Siegel and I were the two key people, so there
22   may have been a little delay at that time from my
23   respect because it was a very large case that we don't
24   need to get into here.
25   BY MR. FARRIER:

**Page 116**

1    Q. And all I'm trying to establish here is if you
2    step back and look at the time frame --
3    A. Yes.
4    Q. -- the first time that the FAC had an opportunity
5    to look at the full application was not until February
6    of 2006.
7    A. That's the way it appears with the delivery of the
8    business plan, yes.
9    Q. And I think that the way -- I'm not going to
10   improve, necessarily, on the way that you put it in the
11   middle of your answer there, which is there were delays on
12   both sides at different times and the fault for that delay
13   should be shared equally.
14   A. That's what I'm saying.
15   MR. FARRIER: That's all I have. Your counsel may
16   have questions, but I doubt it.
17   MR. LENOX: I don't have any follow up questions.
18   He will read.
19   (The deposition was concluded at 4:01 p.m.)
20
21
22
23
24
25

29 (Pages 113 to 116)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a

Page 117

```
 1              CERTIFICATE OF OATH
 2    State of Florida)
      County of Orange)
 3
         I, the undersigned authority, certify that David
 4    Crabtree personally appeared before me and was duly sworn
      on May 17, 2010.
 5
         WITNESS my hand and official seal this
 6    4th day of June, 2010.
 7
 8           Emily W. Andersen
             ─────────────────────
 9           Emily W. Andersen
             Notary Public, State of Florida
10           Commission No. DD577617
11           Expires October 14, 2010
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 118

```
 1              DEPOSITION CERTIFICATE
      State of Florida)
 2    County of Orange)
 3       I, EMILY W. ANDERSEN, Registered Merit Reporter,
      certify that I was authorized to and did stenographically
 4    report the deposition of David Crabtree; that a review of
      the transcript was requested; and that the foregoing
 5    transcript, pages 3 through 120, is a true and complete
      record of my stenographic notes.
 6
         I further certify that I am not a relative, employee,
 7    attorney, or counsel of any of the parties, nor am I a
      relative or employee of any of the parties' attorney or
 8    counsel connected with the action, nor am I financially
      interested in the action.
 9
         DATED this 4th day of June, 2010.
10
11
             Emily W. Andersen
12           ─────────────────────
             Emily W. Andersen, RMR
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 119

```
 1         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF SOUTH CAROLINA
 2                 FLORENCE DIVISION
 3             CASE NO.: 4:08-cv-3590-TLW
 4    WESTGATE MYRTLE BEACH, LLC, a
      Florida Limited Liability
 5    Company,
 6         Plaintiff,
 7    vs.
 8    HOLIDAY HOSPITALITY
      FRANCHISING, INC., a Delaware
 9    Corporation,
           Defendant.
10    _____/
11    IN RE: Deposition of David Crabtree
      TAKEN ON:  May 17, 2010
12    DATE SENT TO WITNESS:  June 4, 2010
13    TO:  Amanda L. Chapman, Esquire
           Greenspoon Marder, P.A.
14         201 East Pine Street
           Suite 500
15         Orlando, Florida 32801
16         The above referenced transcript has been completed and
      awaits reading and signing.
17         Please notify the deponent to contact your office to
      make arrangements to read your copy of the transcript.
18    Please complete by July 7, 2010.
           The original of this deposition has been forwarded to
19    the ordering party and the errata, once received, will be
      forwarded to all ordering parties as listed below.
20
         Thank you.
21         Emily Andersen
22
23    cc:  Richard A. Farrier, Jr., Esquire, Nelson, Mullins,
      Riley & Scarborough, LLP, 151 Meeting Street, 6th Floor,
24    Charleston, South Carolina 29401
25
```

Page 120

```
 1              ERRATA SHEET
 2    Do not write on transcript - enter changes on this sheet.
 3    IN RE:  Westgate Myrtle Beach vs. Holiday Hospitality
      Franchising, Inc.
 4    DEPO OF:  David Crabtree
      TAKEN ON:  May 17, 2010
 5
 6    Page #   Line #   Change/Correction        Reason
 7
 8
 9
10
11
12
13
14
15
16
17
18
19    Under penalties of perjury, I declare that I have read the
      foregoing document and that the facts stated in it are
      true.
20
21    Date          Signature of Deponent
22
23    ─────────────────────────────
24              David Crabtree
25
```

30 (Pages 117 to 120)

65ac83e9-7cd0-46b9-9b17-b2cef3107b5a