IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| WESTGATE MYRTLE BEACH, LLC, a Florida Limited Liability Company | ) ) ) | |
| | ) | C.A. No. 4:08-cv-03590-JMC |
| Plaintiff, | ) ) | |
| v. | ) ) | **ORDER** |
| HOLIDAY HOSPITALITY FRANCHISING INC., a Delaware Corporation, | ) ) ) ) ) | |
| Defendant. | ) ) | |

This matter comes before the Court upon motion of Defendant Holiday Hospitality Franchising, Inc. ("Holiday") for an order granting it summary judgment on Holiday's counterclaim for attorney's fees and expenses and cross-motion of Plaintiff Westgate Myrtle Beach, LLC ("Westgate") seeking dismissal of Holiday's counterclaim. For the reasons set forth below, the Court GRANTS Holiday's motion and DENIES Westgate's motion.

**FACTUAL BACKGROUND**

The present dispute arises from the purchase by Westgate, a timeshare developer, of a beachfront resort property in Myrtle Beach (the "Property"). In September 2004, Westgate entered into an agreement (the "Purchase Agreement") with the seller, MB Inn, Inc. ("MBII"), to purchase the Property for $18,000,000.00.

When the Purchase Agreement was executed, MBII was party to a ten-year license agreement (the "MBII License Agreement"), with Holiday for the operation of the Property as a Holiday Inn hotel. The MBII License Agreement, which was not set to expire until June 30, 2009,

1

required payment by MBII to Holiday of liquidated damages in the event of MBII's breach of the License Agreement. Because the MBII License Agreement was non-transferable, any sale of the Property to Westgate would constitute a breach, thereby triggering MBII's obligation to pay liquidated damages to Holiday in the amount of $1,264,379.20 (the "Liquidated Damages").

As part of its due diligence on the Property, Westgate reviewed the MBII License Agreement before executing the Purchase Agreement. From that review, Westgate learned that a sale of the Property at that time would constitute a breach of the MBII License Agreement and that, as a result, Holiday would be entitled to recover Liquidated Damages from MBII. Westgate also became aware prior to entering into the Purchase Agreement that MBII had no right to unilaterally transfer the MBII License Agreement to Westgate and that, consequently, Westgate would have to negotiate separately with Holiday for its own license in order to continue operating the Property as a Holiday Inn.

In light of these provisions in the MBII License Agreement, Westgate and MBII included in the Purchase Agreement a requirement that Westgate prior to closing either 1) secure a release from Holiday of MBII's obligation to pay the Liquidated Damages or 2) indemnify MBII and post security in the amount of the Liquidated Damages. MBII had no obligation to close on the Purchase Agreement unless Westgate satisfied this requirement. Thus, under the terms of the Purchase Agreement, Westgate voluntarily assumed MBII's liability for the Liquidated Damages as part of its acquisition costs of the Property.

When Westgate executed the Purchase Agreement on September 24, 2004, Westgate had not yet approached Holiday regarding whether or not Holiday would be willing to enter into a license agreement with Westgate. Indeed, as of the date it agreed to purchase the Property, Westgate had

received no assurance from anyone that Holiday would approve Westgate for a license. Thus, when Westgate agreed to assume MBII's liability for the Liquidated Damages, it had no basis to expect that Holiday would allow Westgate to operate the Property as a Holiday Inn.

After the Purchase Agreement was executed, Westgate contacted Holiday for the first time to attempt to negotiate a transfer of the license to Westgate for the remaining 4.5-year term of the MBII License Agreement. Westgate became aware during this period that Holiday had a formal review process for all license applications, and that the decision whether to approve or deny any license would ultimately be made by Holiday's review committee and not the individuals with whom Westgate interfaced.

In connection with its application for a license, Westgate provided Holiday with a general outline of its plans for the Property at that time. Westgate informed Holiday that it was the largest privately-held timeshare company in the world and intended to convert the Property entirely into a timeshare resort over a period of approximately 10 years. In the meantime, Westgate proposed to license all of the hotel rooms at the Property as a Holiday Inn in order to generate occupancy and revenue, and remove hotel rooms from the requested license agreement on a floor-by-floor basis as needed for timeshare sales. In essence, Westgate's intention at this point was to use the Holiday Inn reservation system to generate revenue at the Property until it could convert the Property entirely into a timeshare resort.

Before Westgate closed on its purchase of the Property, Holiday informed Westgate that its license approval committee had denied Westgate's request for a transfer of the MBII License Agreement or any long-term license arrangement. Additionally, Holiday refused to release MBII from its obligation to pay the Liquidated Damages if the sale to Westgate closed. Subsequently, in

3

accordance with the terms of the Purchase Agreement, Westgate paid the Liquidated Damages into escrow and closed on the purchase knowing that it had no long-term agreement for the license of the Property as a Holiday Inn.

Although it denied Westgate's application for a long-term license agreement, Holiday did offer to enter into a temporary license agreement that would allow Westgate to operate the Property as a Holiday Inn for a period of six months following the closing. According to Westgate's counsel in connection with the transaction, Holiday's stated purpose in offering the six-month license term was merely to allow time for Westgate to transition the Property away from the Holiday Inn brand. It is undisputed that Westgate received no assurance from Holiday at this time that Holiday would subsequently agree to extend the temporary license on a long-term basis.

After the closing occurred, Westgate and Holiday negotiated the terms of a temporary license agreement, which was back-dated to December 2, 2004, in order to coincide with Westgate's closing on the Property (the "Temporary License Agreement"). Westgate began operating the Property as a Holiday Inn on or about the same date.

The Temporary License Agreement was transacted at arm's length following active negotiations in which Westgate was represented by legal counsel. The agreement generally provided that Westgate would get the benefit of the Holiday Inn brand, worldwide reservation system, worldwide advertising and marketing, training and web sites (among other things) in exchange for the payment of certain licensing fees and other compensation to Holiday (the "Licensing Fees"). The amount of the Licensing Fees was determined based upon revenue Westgate received from guests staying at the Property.

4

The Temporary License Agreement also expressly provided for automatic termination upon the expiration of 6 months from the effective date and states that "[l]icensee acknowledges and agrees that this License confers upon Licensee absolutely no rights of license renewal following expiration of the License Term." The agreement also includes an "Entire Agreement" clause, which provided in relevant part:

> This is the entire agreement between the parties pertaining to the licensing of the Hotel and supersedes all previous negotiations and agreements between the parties pertaining to the licensing of the Hotel as a Holiday Inn . . . . No change in this License will be valid unless in writing signed by both parties.

Thus, the agreement expressly prohibited any extension of the license term without the parties' written agreement.

In addition, the Temporary License Agreement in Section 14(J) provided for recovery of Holiday's attorney's fees and costs in the event that Westgate's conduct required Holiday to enforce the agreement. Specifically, the agreement provides in relevant part as follows:

> Licensee agrees to pay Licensor all expenses, including reasonable attorney's fees and court costs, incurred by Licensor . . . to remedy any defaults of or enforce any rights under the License, effect termination of the License or collect any amounts due under the License.

The parties operated pursuant to the terms of the Temporary License Agreement for the entire period in which Westgate operated the Property as a Holiday Inn.

Shortly after Westgate closed on the Property, Westgate and Holiday began discussing the possibility of Westgate operating a timeshare resort in conjunction with a Holiday Inn at the Property on a long-term basis. In the context of these negotiations, in early 2005 Holiday began requesting a clear articulation in the form of a written business plan of Westgate's proposal to operate the timeshare component in conjunction with the hotel. It is undisputed that Westgate did

5

not provide the written business plan to Holiday for review until January 2006. Westgate's witnesses acknowledge that the delays in the negotiations and in providing requested materials for review were caused by both parties. As a result of the delays in the negotiations, both parties at different times requested extensions of the Temporary License Agreement, which was extended by written consent of the parties for multiple short-term intervals beyond the original expiration date of June 2, 2005.

At some point in 2006, Holiday informed Westgate that its application for a 10-year license term had been approved by Holiday's franchise approval committee. By mid-2006, the negotiations had reached a point where Westgate believed a deal was likely as long as the parties could come to terms on how the timeshare component would work in conjunction with the hotel portion of the Property. Ultimately, however, the parties did not come to terms regarding the timeshare issues, and Holiday informed Westgate in March 2007 that it did not intend to negotiate further. Thereafter, the parties executed a final written extension of the Temporary License Agreement for the purpose of allowing for a transition of the Property to another non-Holiday brand, and the Temporary License Agreement subsequently expired according to its terms on May 31, 2007.

Pursuant to the Temporary License Agreement, Westgate operated the Property as a Holiday Inn, used Holiday Inn's worldwide reservation system and got the benefit of Holiday Inn's worldwide marketing and advertising efforts from December 2, 2004, until the Temporary License Agreement expired on May 31, 2007. In exchange, Westgate paid to Holiday the Licensing Fees specified in the Temporary License Agreement for the same period totaling $920,000.00, which represented primarily a percentage of revenue that Westgate received from guests staying at the Property for this period. It is undisputed that Holiday met its obligations under the Temporary

License Agreement throughout the term of the agreement, provided no assurance that the parties would ultimately come to terms on an extension, and made no misrepresentations of fact to Westgate. Indeed, Westgate's corporate designee at his deposition could identify nothing that Holiday did to cause Westgate harm other than receive payment of the Liquidated Damages and Licensing Fees and ultimately elect not to extend the Temporary License Agreement on a long-term basis.

## PROCEDURAL HISTORY

Westgate filed suit against Holiday alleging claims for unjust enrichment and promissory estoppel. Specifically, with regard to the claim for unjust enrichment, Westgate alleged that Holiday received a benefit in the form of payment by Westgate of the Liquidated Damages and the Licensing Fees, which Westgate characterized as a "double recovery." According to Westgate, it would be inequitable for Holiday to retain these funds because Westgate only paid the Liquidated Damages and Licensing Fees based upon its belief that the parties would eventually enter into a long-term franchise agreement. The promissory estoppel claim was based upon Holiday's alleged promise to Westgate that it "was amenable to the execution and consummation of a long-term license agreement with Westgate" and "had in fact approved Westgate for a new long-term license term" and Westgate's alleged reliance upon these promises to its detriment. Holiday denied the allegations and counterclaimed for recovery of its fees and expenses pursuant to Section 14(J) of the Temporary License Agreement.

Westgate moved to dismiss Holiday's counterclaim, and Holiday moved for summary judgment on both Westgate's claims and its own counterclaim for fees and expenses. In response to Holiday's motion, Westgate conceded Holiday was entitled to summary judgment on Westgate's

7

claims and opposed only Holiday's motion for recovery on the counterclaim. In light of Westgate's concession, the Court previously granted Holiday summary judgment on Westgate's claims, such that the only issue currently before the Court is Holiday's entitlement to attorney's fees and expenses.

## DISCUSSION

The Temporary License Agreement expressly provides for Holiday's recovery of attorney's fees and expenses in the event that Holiday is required to "enforce any rights under" the Temporary License Agreement. Holiday defended this case on several grounds, including that Westgate's claim is barred by the plain language in the Temporary License Agreement providing that the license expired after 6 months, Westgate had no unilateral right of renewal, the Temporary License Agreement represented the "entire agreement" of the parties, and the written agreement required any extensions of its term to be set forth in a writing signed by both parties. Additionally, Holiday argued that Westgate's unjust enrichment claim is barred pursuant to the firmly-established rule that there can be no claim for unjust enrichment where the parties' relationship is governed by an express agreement – namely, the Temporary License Agreement. Furthermore, it is undisputed that Westgate has sought in this lawsuit to recover the Licensing Fees it paid to Holiday pursuant to the Temporary License Agreement, and that Holiday's right to receive and retain those Licensing Fees is a right that exists "under" the Temporary License Agreement. Consequently, this lawsuit has forced Holiday to "enforce" rights under the Temporary License Agreement, and Holiday is therefore entitled to recover its fees and expenses under the plain language of the contract.

Westgate argues that Holiday's defense of this action does not constitute enforcement of the Temporary License Agreement because: 1) Holiday was not the party that filed suit and 2)

Westgate's claim for recovery of the Licensing Fees was based upon equitable theories rather than upon breach of contract.

As for Westgate's first argument – that Holiday has not enforced the Temporary License Agreement because it is not the plaintiff in this case – absolutely nothing in the Temporary License Agreement or the definition of the term "enforce" limits applicability of the fee provision to situations where Holiday has initiated the lawsuit. Indeed, Westgate apparently acknowledges that Holiday's successful defense against a claim for *breach* of the Temporary License Agreement would entitle Holiday to recover its fees.[1] If Holiday would be entitled to recover its fees incurred in defending a claim asserted expressly under the Temporary License Agreement, the mere fact that Holiday is the defendant in this case cannot by itself render the fee provision inapplicable. In any event, the definition of "enforce," which means "to give force or effect to (a law, etc.)," is much broader than Westgate allows. *Black's Law Dictionary* (7th Ed.). Although cases in which Holiday successfully sued Westgate to remedy a breach plainly would require the Court to "give force or effect to" the Temporary License Agreement, the definition also encompasses situations such as the present case in which Holiday has successfully prevailed against Westgate's attempt to deny Holiday a right expressly provided for under the Temporary License Agreement. For example, Holiday received the Licensing Fees and has the right to keep them only because the Temporary License Agreement expressly provides for it. With the grant of summary judgment dismissing Westgate's

---

[1] Westgate states in its opposition memorandum that "Westgate has NOT sought the return of the fees paid under the Temporary License Agreement upon the basis that the Agreement was somehow unenforceable or that any provision of the Agreement was breached, ***such that Defendant would in turn be forced to seek the enforcement of the terms of the Agreement***." (Opp. Mem. p. 7-8) (emphasis added).

claims, that right has been given force and effect, thereby entitling Holiday to recover its attorney's fees and expenses under the plain language of the Temporary License Agreement.

Westgate's second argument – that the fee provision does not apply because Westgate's claims are based in equity rather than breach of contract – fails because it is the nature of Holiday's defense, not the legal dressing of Westgate's claim, which determines whether Holiday has had to "enforce" the Temporary License Agreement. Westgate could have styled its allegations in this case as a claim for breach of contract, breach of the implied covenant of good faith and fair dealing, or as one of any number of equitable claims (or all of the above). Regardless of the legal theory, Holiday would have defended by reliance upon the express terms of the Temporary License Agreement, which contains the only obligations Holiday had to Westgate. Moreover, the fact remains that no matter its legal theory, the *remedy* Westgate sought was recovery of the Licensing Fees, thereby requiring Holiday to enforce its right under the Temporary License Agreement to keep them. Westgate cannot through artful pleading obscure the fact that this case is at bottom a dispute over ownership of the Licensing Fees paid under the terms of the Temporary License Agreement. Having in essence acknowledged the "enforceability" of the Temporary License Agreement and Holiday's right thereunder to retain the Licensing Fees by conceding summary judgment to Holiday on the merits, Westgate is thereby contractually liable for Holiday's attorney's fees and expenses.

As further support for Holiday's claim, another district court within the Fourth Circuit recently awarded Holiday its attorney's fees in connection with its defense of a similar franchise dispute based upon exactly the same license agreement fee provision. *Lake Wright Hospitality, LLC v. Holiday Hospitality Franchising, Inc.*, 2009 U.S. Dist. LEXIS 73903, *28 (E.D. Va. 2009). Westgate attempts to distinguish *Lake Wright* on three bases: 1) the plaintiff in *Lake Wright* ("Lake

Wright") asserted a breach of contract claim; 2) Lake Wright did not dispute that Holiday had been forced to "enforce" the license agreement by defense of the action; and 3) the dispute allegedly arose during the term of the license agreement. None of these arguments meaningfully distinguishes *Lake Wright* from the instant case.

First, the fact that Lake Wright asserted a claim for breach of contract represents a distinction without a difference for the reasons set forth above – namely, that under the language of the Temporary License Agreement Holiday's entitlement to fees turns on the nature of its defense, not the legal dressing of the plaintiff's claim. The defense Holiday asserted in *Lake Wright* was the same one asserted here. Lake Wright claimed, *inter alia*, that Holiday violated the implied covenant of good faith and fair dealing and in a variety of ways. *Lake Wright*, at *24. The Court agreed with Holiday, however, that the license agreement expressly gave Holiday the right to take the action alleged to constitute breach of the implied covenant of good faith and fair dealing, such that the claim failed as a matter of law. *Id*. Thus, as in the instant case, the plaintiff in *Lake Wright* sought to impose extra-contractual duties on Holiday, to which Holiday defended by demanding enforcement of the license agreement, which defined the only rights and obligations between the parties.

Next, Westgate argues that *Lake Wright* is distinguishable because it was undisputed in that case that Holiday was entitled to fees. Lake Wright's management witnesses apparently did concede in deposition testimony that if Holiday prevailed, its successful defense of the suit would result in the enforcement of the license agreement. *Id*. at *27. That Lake Wright's representatives conceded the obvious, however, hardly supports Westgate's argument in this case. In any event, it is clear from the *Lake Wright* opinion that the plaintiff did contest Holiday's fee request at the summary

11

judgment stage on several grounds, including that the action did not require Holiday "to remedy a default, enforce a right, effect termination, or collect any amount due under the License Agreement." *Id*. Despite these arguments, the Court awarded Holiday its fees pursuant to the same provision at issue here.

Finally, Westgate claims *Lake Wright* is also distinguishable because the dispute apparently resulted during the term of the license agreement. Westgate fails to cite where this fact is located in the opinion, and the Court could not determine from the opinion when the dispute arose. In any event, the opinion does not even mention the timing of the dispute in its discussion of the attorney's fee issue, and Westgate provided no explanation in its opposition brief or at the hearing on these motions as to the timing's significance. Consequently, even assuming the dispute arose during the term of the license agreement, neither that fact nor any of the others cited by Westgate meaningfully distinguishes *Lake Wright* from the instant case.

Further supporting Holiday's position, the Tennessee Court of Appeals, when faced with a similarly-worded fee provision, held that a defendant who relied upon the contract to defend against a claim for unjust enrichment was entitled to recover attorney's fees incurred in connection with the defense. *Segneri v. Miller*, 2005 Tenn. App. LEXIS 685 (October 19, 2004), *cert. denied.*, 2005 Tenn. LEXIS 256 (Mar. 21, 2005) (attached as **Exhibit O**). *Segneri* involved a landlord-tenant dispute, in which the plaintiff tenants claimed they were entitled to reimbursement from the landlord for improvements the tenants made to the subject residence. *Id*. at *1. The trial court had permitted recovery on an unjust enrichment theory and denied the landlord's request for recovery of attorney's fees incurred in connection with the defense. *Id*. at *14. The Court of Appeals reversed. *Id*. at *18, *21. First, the Court found that there was a written lease agreement that governed the parties'

12

respective rights and obligations, and the lease did not permit recovery by the tenant of the value of the improvements. *Id*. In fact, the lease contained a "surrender" provision stating that upon expiration of the lease the tenant must surrender all alterations or additions to the landlord. *Id*. at *17. In view of the express agreement between the parties, the Court held that the tenants could not recover the value of the improvements on an equitable theory of unjust enrichment. *Id*. at *15-18.

Next, the Court considered the landlord's motion for attorney's fees incurred in connection with its defense of the action. The lease provided that the landlord was entitled to recover its reasonable attorney's fees if it became "necessary for the Lessor to employ an attorney to enforce or defend any rights or remedies hereunder". *Id*. at *19. Holding that the landlord was entitled to recover fees incurred in connection with its defense of the claim for unjust enrichment, the Court concluded as follows:

> Clearly the attorney's fees incurred by the [landlord] to defend against the [tenant's] demand for reimbursement for improvements was predicated on the Surrender provision of . . . the lease. Accordingly, we reverse the decision of the trial court in denying the [landlord's] request for attorney's fees with regard to the issue of improvements.

*Id*. at *21. It therefore made no difference to the court that the tenants were pursuing an unjust enrichment theory rather than a claim for breach of the lease. *Id*. The key issue under the fee provision – which is nearly identical to the one in the instant case – was whether or not the landlord's defense was predicated on the lease. *Id*. Because its defense plainly was grounded upon the lease and the landlord prevailed on that defense and thereby enforced the lease, it was entitled to recovery of its attorney's fees. *Id*. Likewise, in the instant case, because Holiday's successful defense to Westgate's claims was predicated upon the Temporary License Agreement, Holiday is entitled to its attorney's fees and costs under the plain language of the agreement.

13

## CONCLUSION

For all of the reasons set forth above, the Court hereby GRANTS Holiday's motion for summary judgment as to its counterclaim for attorney's fees and expenses and DENIES Westgate's motion to dismiss Holiday's counterclaim. Counsel for Holiday and Westgate shall confer regarding the amount of Holiday's fees and expenses and, if Westgate objects to the amount, Holiday shall submit an affidavit of fees and expenses for consideration by the Court.

**IT IS SO ORDERED.**

s/J. Michelle Childs
United States District Judge

Greenville, South Carolina
November 16, 2010